[No. 4148.   Decided April 22, 1902.]

CLYDE GUY SROUFE *et al., Respondents,* v. MORAN BROS.
COMPANY, *Appellant.*

MASTER AND SERVANT — WHEN FELLOW SERVANT BECOMES VICE PRIN-
CIPAL.

Where the foreman of a shipyard in charge of the construction
of a vessel was compelled, by reason of the location and distance
of the winch used in raising timbers, to employ an intermediary
for the purpose of signalling the men in charge of the winch, in
respect to paying out or taking in the rope for the purpose of
hoisting or lowering timbers, the fact that such intermediary was
a ship carpenter, taken from his work and used to transmit the
foreman's signals, would make him for the time being, while dis-
charging that duty, a vice principal, and injuries resulting to an-
other ship carpenter on account of his negligence, while in the
performance of a duty devolving upon the master, could not be
chargeable to the act of a fellow servant.

SAME — INJURIES TO SERVANT — MASTER'S DUTY — INSTRUCTIONS.

In an action to recover for the death of a ship carpenter
caused by the falling of a cant timber upon the staging where he
was at work, an instruction that "whatever was necessary or
needful or useful in order to raise the cant in an ordinarily safe
manner, and consistent with the care and caution necessary to
render safe and free from danger the workmen engaged in it, are
instrumentalities or appliances, within the meaning of the law,
whether the same be ropes, engines, platforms or staging, or serv-
ants; and it is the duty of the master to furnish all such neces-
sary instrumentalities and appliances, whether ropes, machinery,
staging or servants, and that they shall be reasonably suitable
and competent," is not erroneous on the ground of making the
master an insurer of the servant's carefulness, while the law re-
quires only reasonable care in their selection and retention, where
other instructions given told the jury that it was the duty of the
master to provide all necessary appliances, including servants,
and that they were to be reasonably suitable and competent, and
that the master had discharged his duty in this respect when he
had exercised reasonable care to provide such.

SAME — RELEVANCY OF INSTRUCTIONS TO PLEADINGS.

Such instruction is not erroneous on the ground of tending to
confuse and mislead the jury because outside of the issues, in

that there is no claim in the pleadings that the injured party had been required to work with an incompetent fellow servant, since the carelessness and negligence of the vice-principal in the arrangement of his appliances is fully alleged.

SAME — INSTRUCTIONS ON QUESTION OF NEGLIGENCE — HARMLESS ERROR.

Where there was no evidence of negligence on the part of deceased an instruction was nothing more than harmless error, when it charged the jury that "mere negligence on the part of the deceased . . . is not sufficient to prevent recovery . . . for injury caused by the negligence of the defendant."

SAME — QUESTION FOR JURY.

In an action to recover for the death of an employee caused by the negligence of defendant, a question for the jury is presented, although there was no direct evidence that the accident was caused by the fouling of a rope, when the evidence tends to show that deceased was killed by a heavy cant striking the platform upon which he was working in the construction of a vessel, that the cant had hung suspended for awhile, and then came down with a rush; that it was controlled by a rope attached to a donkey engine, and that this rope was made of two ropes tied in a knot, instead of being spliced together; that there was a possibility of the knot catching on the wharf or on one of the shores which braced the vessel; that the men at the engine kept paying out rope attached to the cant in response to signals until quite a good deal of slack had piled up on the wharf; that the cant would not come down and that the foreman took hold of a fall rope and surged upon it with all his weight, when the cant suddenly fell with a crash, causing the injuries complained of.

Appeal from Superior Court, King County.—Hon. WILLIAM R. BELL, Judge. Affirmed.

*Preston, Carr & Gilman,* for appellant.

*Ballinger, Ronald & Battle,* for respondents.

The opinion of the court was delivered by

WHITE, J.—This is an appeal from a judgment rendered by the superior court of King county on the verdict of a jury in favor of the respondents and against the ap-

pellant for the sum of $6,500 and costs. The action is by the minor children of one Henry C. Sroufe, deceased, to recover damages for the death of their father, occasioned by accidental injuries received while in the employ of the appellant as a ship carpenter. Omitting formal allegations, the material allegations of the complaint are, in substance, that while so employed as a ship carpenter the said Henry C. Sroufe was directed by the vice principal of the defendant, the shipyard foreman, to go upon a high scaffolding which the defendant had erected on said yard, and surrounding a vessel in the course of construction, and there assist in putting in place the cant timbers which the defendant was about to attempt to raise; that said cant frames or timbers were heavy wooden frames, or ship ribs, which were required to be adjusted to the keel of said vessel and a supporting harping near the top of said cant; that, to so adjust the cant, it was necessary first to hoist it, and then lower it gradually to a proper place of adjustment, and for the purpose of hoisting and lowering it in place, so that it could be adjusted and fastened, defendant provided an engine located near the stem of the vessel, and also blocks with tackle and rope running to a temporary derrick or gin pole situated near the cant, which was at the stern of the vessel, which rope was fastened to the cant, and also provided jackscrews, resting upon blocks laid on cross timbers or spales for use underneath, or at the lower end of the cant; that it was the duty of Henry C. Sroufe, under directions to him from the yard foreman, to stand and remain upon the scaffolding aforesaid (it being about thirty feet in height) while the cant was being hoisted and lowered, to assist in the work, and keep the cant in place until it could be fastened; that in attempting to hoist and adjust the first cant, which was a very heavy

one, and to fasten same near the stern of the vessel, it had been hoisted into the air, and was hanging suspended by means of the ropes fastened as aforesaid, and on a jack-screw resting on planks laid across the spales beneath the lower end, and while the same was thus suspended and hanging and being lowered to its proper place, and while Henry C. Sroufe was on said scaffolding, and in the performance of his duties, and under the direction of the foreman aforesaid, and in the exercise of due and proper care, and without any negligence whatever on the part of said Henry C. Sroufe, the rope and said tackle slipped or gave way, and the spales and cross planks and the jackscrews sprung or gave way, whereby and by reason thereof the heavy cant fell against the staging upon which Henry C. Sroufe was standing, with such rapidity and violence that it knocked the same down, and precipitated the deceased some thirty feet to the deck below, with such force that he was fatally injured, and from such injuries, and as a result thereof, shortly thereafter died; that the falling of the cant, and the consequent killing of the deceased, were on account of the negligence of the defendant and its foreman, in that the foreman failed and neglected to provide and furnish the deceased with a safe place in which to work or to discharge his duties, and failed and neglected to provide suitable, proper, sufficient, adequate, or serviceable ropes, tackle, instrumentalities, and appliances, and to adjust or arrange the same in a suitable, proper, and safe manner, so that the same would work properly and safely, and failed and neglected to properly strengthen or to provide suitable spales, timbers, or staging underneath the jackscrews for the raising, catching, holding, or bearing of the weight necessary to rest upon the jackscrews in the process of lowering the cant, and said foreman employed by the defendant was negligent and careless in constructing, arranging,.

managing, and operating the ropes, tackle, instrumentalities, and appliances as aforesaid, and the defective, unsuitable, and inadequate apparatus, and the negligent and careless management and operation thereof, and the manner of attaching and adjusting the same, as provided, furnished, and operated by the defendant and its foreman, rendered the same inadequate, unsuitable, unsafe, and dangerous, and rendered the place provided for deceased in which to work a dangerous and unsafe place to work, all of which facts were known to defendant and its foreman, and were unknown to deceased at the time of the accident or at all; that said accident occurred while the deceased was in the discharge of his duties under the direction of the foreman of said defendant, and while the deceased was in the exercise of due and proper care, and without negligence or notice of any of the things heretofore mentioned, and was owing wholly and solely to the failure and negligence of the defendant and its foreman as above alleged.

The following are the facts surrounding the accident:

Among other branches of industry, the appellant conducts a ship yard, in which wooden ships are built. On the 29th of May, 1900, appellant had on its ways, in process of construction, the barkentine Minnie E. Caine. Appellant's shipyard and the construction of the ship were in charge of a shipyard foreman, one George R. E. Monk, who had full direction and control of the men working upon this vessel. It was on this day, and while working on this vessel, that Henry C. Sroufe received the injuries from which he died. At the time of the accident the shipyard crew was composed of said Monk, some ten or twelve ship carpenters, and two winchmen; the latter having charge of the donkey engine or winch used in hoisting. The crew at this time were engaged in putting a cant in place in the after framework of the vessel. The keel, in framing, was on blocks

25—28 WASH.

built up over four feet high. Fastened to the ribs or frames of the ship during her construction, and running lengthwise from stem to stern, were large timbers called "ribbons." There were a number of parallel ribbons, one above the other, with intervals of only a few feet between them; the lowest ribbon being under the bilge of the ship, and the highest ribbon at the top of the ribs or frames. Standing on end and underneath the body of the ship were many upright timbers, called "shores" or "standards." The ship was being constructed on a planked wharf. The lower end of these shores rested on the wharf, the upper ends being fastened under and against the lower surface of these ribbons. The purpose of these shores was to hold the ship up and in place during construction, and they were firm and solid under the weight of the vessel. There were two rows of these shores all around the ship, and in some places three rows, the row set under the ribbon fastened under the bilge being called "bilge shores," in distinction from the rows of shores set under other ribbons. These rows of shores were not straight, but, like the ribbons under which they were set, conformed to the curvature of the ship. The keel of the ship was 180 feet in length. These shores were six or seven feet apart. The shores under one ribbon were not set opposite the shores under another ribbon, but were, like brickwork, set between or apparently alternating. Looking from forward toward aft, or *vice versa*, these shores presented the aspect of an irregular forest of uprights; the arrangement in this ship actually making a shore standing in every two feet of distance. Owing to the height of the vessel above the wharf, a sort of a platform had previously been constructed under the sides of the vessel, and underneath the frames on which the workmen stood to drive bolts upward. This platform had consisted of one or more loose planks laid on cross timbers called "spales,"

extending at right angles to the keel. These spales or cross timbers were of different dimensions,—from 5 by 5 to 6 by 6. They were from eight to ten feet apart, there being from eighteen to twenty of them on the port side of the vessel. They were resting on blocks one foot high set on the wharf. These cross spales were about twenty-five feet long, and extended from the keel out beyond the outer row of shores. Some of them rested against the shores at one end, and some against the keel blocks at the other. All of the ribs in the ship known as the "square frames" had been raised and fastened onto the keel. The frames or ribs aft of these square frames, and which were to be fastened to the deadwood, are called "cants." The cants are heavy sticks of timber, bowing in shape, and forming, with the square frames in front, the framework upon which the outside planking of the vessel is laid. The cant being raised at the time of the accident weighed over a ton. In this vessel there were eight or ten of these aft cants to be raised and attached on each side. These cants were each composed of a number of sticks, and were framed together, and the cants fashioned on the place on each side of the stern where they were to be raised. The lower end of the cant, or the heel, was to be set or adjusted to a particular line on the deadwood, and there fastened by bolts to be run through holes bored in the cant and through the deadwood. These holes were bored before raising. A large timber called a "harping," which is a continuance of the ribbons, ten inches wide, and on a plane with and near the top of the cants when raised, was fastened and extended from the square frames to the stern post of the vessel. The tops of the cants, when raised and set in place, would rest against this harping. To fasten or adjust the cant in place, it was necessary to raise the cant and fasten it to its proper place on the deadwood. The following method was used to put

the cant in place and fasten it: Two chains were attached
to the cant, one near the heel or lower end, and the other
at some distance from the top.    These chains were then
connected with a connecting chain called the "bridle
chain."  To this bridle chain a rope or hoisting line was at-
tached.    This hoisting line was then attached to a
tackle consisting of two pulleys, with two sheaves each,
the fall of which ran through a sheave or pulley near
the top of a derrick erected on top of the deadwood,
and immediately over the place where the cants were to be
fastened.    Thence the fall ran down to and through a
sheave in a snatch block fastened to the deck of the wharf,
almost immediately under the derrick or under the keel,
from which the rope was conveyed to a forward snatch
block fastened forward of the bow of the ship, and under-
neath a raised wharf or platform, and thence through the
sheave in this forward snatch block up through this raised
wharf to the winch or donkey engine set upon this raised
platform.    After the cant was raised as near to its right
place as was practicable with tackle, it was caught by shov-
ing a jackscrew under a set bolt previously fastened for the
purpose in the face of the heel of the cant.    The man hand-
ling the jackscrew, with other men assisting in adjusting
the lower end of the cant, and ready to fasten in place, had
to take position and work immediately under, and nearly
up to the level of, the point where the heel was to be fast-
ened.    Owing to the height of the ship above the wharf, this
required the erection of a platform of sufficient strength to
hold the men and the weight of the cant.    The jackscrew
rests on this platform; its lower end out somewhat from
perpendicular; its top inclined toward the deadwood.    To
give its purpose substantially as set forth in the evidence:
"The purpose of the jackscrew is to take a cant and hold
it against the deadwood, and also to lower the cant to place

when the tackle stops it above; and when the tackle lets it fall below the place, as is frequently the case, the jackscrew raises it to its place. The whole weight at times rests on this jackscrew. Sometimes it has to be raised five inches. In addition to the purpose of raising and lowering the cant, the jackscrew also presses against the deadwood." This platform was a necessary appliance for raising and holding these cants, and it was not possible to raise them without this platform and jackscrew. This platform consisted of plank three inches in thickness fastened onto cross spales. One end of these spales rested on a cleat 6 by 6, securely spiked to the keel; and to prevent its shoving or working away from the keel, and to hold it solid under the outward shove or pressure of the weight on the jackscrew standing at an angle as above mentioned, this platform, prior to the commencement to raise, had one of its spales or cross timbers on which it rested ten or twelve feet in length, and extending out to, and securely spiked to, one of the shores. The shore was solid underneath the weight of the ship, and by its construction the platform was sufficiently strong. The winch was in advance of the stem of the ship, and was fully 200 feet forward of the point where the cant was to be fastened, and about twenty-five feet to the left of the port bow. The rope was not long enough to reach the winch.

The evidence is conflicting as to whether the use of but a single rope was sufficient, under the circumstances, in this instance. Monk, the vice principal of the defendant, testified that they did not have a rope long enough in the yard; that they could have had one long enough, but would have had to send uptown for it. Monk superintended the rigging of the tackle. Matthewson and Borofski, two of the workmen on the ship, did the work under his supervision. Matthewson asked Monk if he should splice the rope.

Monk was ready to go ahead with the work, and said, "No, tie it." Two ropes, each an inch and a half in diameter, were tied together with a large knot, the knot being about twenty feet forward of the aft snatch block. The evidence is conflicting as to whether this rope ran along the deck of the wharf, or over the top of the cross spales. It ran either over or under the cross spales, diagonally and between, among and through the shores to the forward snatch block; thence through a sheave under the platform on which the donkey engine stood, and up to the winch; being practically underneath the keel at the aft snatch block, and about twenty-five feet therefrom at the forward snatch block. The top of the spales was from seventeen to eighteen inches above the deck of the wharf. Matthewson and Borofski who rigged the tackle under Monk's supervision, say the aft snatch block was rigged so the rope would clear the top of the spales, but the forward snatch block was a little lower than the top of the spale. Monk himself admits that the forward snatch block was about twelve inches high. Monk and others testified that the rope passed under the spales. Geared as this rope was, this knot, in raising the cant and lowering it to place, would move forward from 70 to 100 feet, and thence backward part of the way. The pull on the rope where the knot was was less than one-fourth of the weight, and it would be still less after the jackscrew caught the cant. The moment the rope commences to slack, it drops or bends downward more or less. The rope had more or less elasticity. The testimony is clear that, if the rope went over the top of the spales, the knot was liable to catch or foul. The wharf underneath the spales was uneven, and some of the planks were sticking up above others, and there was liability of the knot fouling even under the spales. There was evidence tending to show that the foreman inspected the rope,

through a workman, to ascertain if it was likely to foul. There was testimony tending to show that if the rope had been one continuous piece, or had been spliced together instead of being tied, it would not have been liable to foul. When they went to raise the first cant, the lower end of the cant slipped under the stage built for the purpose of adjusting the heel of the cant, and under the cross spale, which pressed out to the shore before spoken of. We can better illustrate this part of the statement with the evidence of Joe Landeen, a shipbuilder, whose duty it was to handle the jackscrew. He says, in substance:

"They had had trouble from the very start. The heel of the cant always caught under the spale. They put a line on it, and tried to pull it back several times, but it would not work. It would always come back under. After repeating this for half an hour, Monk said, 'Saw off that spale right here;' referring to the spale upon which the small stage was built, and which ran out to, and was spiked to, the shore. After this was sawed, Monk said, 'Now, go and get a shore and set it under there.' Some one got a shore and set it under."

This was a short block set on end under the spale, and the platform rested on the small block set on end, not fastened to the wharf or braced. Some of the evidence tended to show that it was the duty of the workmen to build their own platforms. But to continue Landeen's narrative:

"Monk then said, 'Now, Joe, you go up and handle that jackscrew.' Joe replied, 'That stage won't be safe now. That will fall down. It ought to be fastened.' Monk said, 'No, that's all right, all right; go ahead; go ahead.' "

The reason that the stage was not strengthened was because Monk would not give them time. They were from an hour to an hour and a half in raising and lowering the first cant. The testimony tended to show that it should have been done in half an hour, if properly done. Monk him-

self testified that he had had considerable trouble with the cant, and things did not go right; that something was wrong, and they raised and lowered it a number of times. It was while hoisting this cant and lowering it to place that the accident occurred. For some reason (the reason is the matter of dispute) the men at the winch let go (that is, allowed all the rope to run off the winch); and the cant, being thus released, fell, breaking down the staging upon which the jackscrew was placed to force the heel of the cant into position, also striking and breaking down the staging upon which the deceased was working, and causing him to be thrown to the deck of the wharf. The winchmen are guided in the operation of the winch by signals, well understood by men in the business, given to them by the foreman, either directly or through some intermediary. In raising the cants or frames, the foreman is compelled by the nature of his work to stand in close proximity to that part of the vessel where the cant or frame is being put in place; and, in raising the after frames or cants of the vessel, the position of the foreman in this instance was so far away from the winch, and his view was so obstructed by other frames in the vessel, that the winchmen could not see him clearly, so that in raising these after cants or frames a man was stationed by the foreman in such a position that he could see the foreman, and the winchmen clearly see him, for the purpose of transmitting the signals given by the foreman for the guidance of the winchmen. The cant in question was to be placed in the after part of the vessel, and the foreman stood two or three hundred feet from the winchmen. He selected from the ship carpenters there employed a man, and put him in a station as a signal passer. The man selected was by the name of Redman,—a ship carpenter in the same employment as the deceased, who had worked under Monk for several years, had frequently

acted as signal passer, and understood the signals. The reason for the accident is a matter of some doubt, but we think from the evidence, that the jury was warranted in believing that the knot in that portion of the rope that led from the aft tackle to the winch caught in a cross spale or shore or on the wharf, thereby holding the cant stationary; that for that reason slack accumulated at the winch, so that when the rope was let loose from the drum of the winch the knot was suddenly released, letting the cant fall abruptly. There is no direct evidence that the knot caught in the manner indicated. There is evidence showing that the foreman gave the signal "All gone," or "Let go," and that it was in response to this signal that the winchmen allowed the rope to run off the drum. There is contradictory testimony, however, as to this. There is considerable evidence to the effect that Monk gave to Redman the signal "Lower away," or "Lower away slowly;" that Redman, in transmitting this signal to the winchmen, instead of giving the signal "Lower away," gave the signal to "Let go," and the winchmen, acting on this signal, did let go, thus allowing the cant to drop. Monk, in signalling to the intermediary, was governed by directions from the man at the jackscrew. The verdict of the jury was general, and it is impossible to tell which theory it adopted.

The court charged the jury as follows:

"I charge you further that the servant does not assume the risks of carelessness of those who undertake to discharge, under the master's directions, the master's duty toward the servant, even if such persons are also servants of the same master; nor does the servant assume risks which he neither knows nor suspects, nor had reason to look for. The risks incident to his employment which he assumes are such risks as he knows, or which by the exercise of ordinary care he should have known of. In this connection, I charge you that while in the discharge of his ordinary duties the

man Redman was a fellow servant of the deceased, yet while engaged in transmitting signals from the foreman, Monk, to the men operating the donkey engine, he was discharging a duty imposed by law upon the vice principal, and was therefore, while so engaged, a vice principal of the defendant; and if you find from a preponderance of the evidence that Redman failed to correctly transmit the signal given him by the foreman, Monk, and by reason of such failure the injury, if any, complained of, was caused, then you must find the defendant was guilty of negligence."

The appellant assigns this instruction as error. The court also refused to give to the jury the following instruction requested by the appellant:

"I charge you that in the case at bar the person stationed to transmit the signals from the foreman to the men at the winch was in the same common employment with the deceased, and was a fellow servant of the deceased, and that the defendant is not liable in this action if you shall find from the evidence that the accident to Sroufe was occasioned by the negligence of such person."

This, also, is assigned as error. The court also refused to give at the request of the appellant the following instruction:

"I charge you that Redman, in his capacity as transmitter of signals from the foreman to the winchmen at or shortly prior to the happening of the injury to Sroufe, was a fellow servant of Sroufe, and the defendant is not responsible for any injury which occurred to Sroufe, directly caused by the negligence of said Redman."

The refusal of the court to give this instruction is also assigned as error. These three assignments of error may be discussed under a single head, as they all involve the same question, viz., the relation of the signal passer, Redman, to appellant and the deceased. The position of the respondents is that Redman, in the performance of the work in which he was engaged at the time of the accident, was a

vice principal, while appellant contends that he was a fellow servant of Sroufe. The lower court, in giving the instruction complained of, and in refusing to give the other two instructions requested by the appellant, adopted respondents' theory, and the case was sent to the jury with the instruction that Redman's negligence was the negligence of the defendant. There was evidence tending to show that it was Monk's fault that caused the accident. There was evidence tending to show that Redman did not transmit to the men in charge of the winch the correct signal given to him by Monk; that he transmitted the signal to "Let go," or "All gone," when the signal was to lower. If Redman was the fellow servant of Sroufe in giving the signals, the instruction of the court was erroneous; for, in effect, it said to the jury that, if either Monk or Redman was at fault, the defendant was liable. The only fault attributed to Redman was in transmitting the signal given to him by Monk. If in transmitting this signal Redman was not the fellow servant of Sroufe, but the agent of Monk, then the instruction was correct. But if Redman was at fault in transmitting the signal, and at the time and in so doing he was the fellow servant of Sroufe, the injury resulted from the acts of a fellow servant, and the appellant would therefore be discharged from liability. Was Redman the fellow servant of Sroufe in transmitting the signals? is the question we are called upon to decide. We think he was not the fellow servant of Sroufe in performing the duty assigned to him by Monk in transmitting Monk's signals. It was the duty of Monk to direct the men in charge of the winch. In using an intermediary for that purpose, the intermediary was not serving in the line of his common employment as a ship carpenter, but was the voice or arm of the principal. An agent does not act as an agent when doing some act entirely outside of his agency. So a fellow

servant, in performing the duties of the master by the direction of the master, becomes the agent of the master in the discharge of that particular duty, and for the time being ceases to be in the common employment. The master is liable for injuries caused by another servant, if they result in the omission of some duty of the master which he had confided to such inferior employee; and the duty of the master is personal, and cannot be delegated. *Costa v. Pacific Coast Co.,* 26 Wash. 138 (66 Pac. 398). Here it was clearly the duty of the foreman to give the signals to the operatives of the winch who controlled the raising and lowering of the cant. When he saw fit to confide that duty to some one else in connection with himself, the intermediary, in performing that duty, was a foreman, because he was the foreman's mouthpiece or voice. Persons working together as fellow servants may be fellow servants with regard to some part of the employment, and principal or master with regard to some particular part of the employment. *Shannon v. Consolidated, etc., Mining Co.,* 24 Wash. 130 (64 Pac. 169); *Uren v. Golden Tunnel Mining Co.,* 24 Wash. 261 (64 Pac. 174); *Costa v. Pacific Coast Co., supra.*

The appellant strenuously insists that the position of Redman was similar to that of a telegraph operator charged with the duty of transmitting the orders of the train dispatcher to the train operators. It has been held that a telegraph operator in the employment of a railroad company, charged with the duty of receiving messages from the train dispatcher and conveying them to the trainmen, is a fellow servant of the trainmen. *Oregon Short Line, etc., Ry. Co. v. Frost,* 21 C. C. A. 186 (74 Fed. 965); *Baltimore & O. R. R. Co. v. Camp,* 13 C. C. A. 233 (65 Fed. 952); *McKaig v. Northern Pacific R. R. Co.,* 42 Fed. 288; *Cincinnati, etc., R. R. Co., v. Clark,* 6 C. C. A. 281 (57 Fed. 125); *Illinois Central R. R. Co. v. Bentz,* 40 C. C. A.

56 (99 Fed. 657); *Slater v. Jewett,* 85 N. Y. 61 (39 Am. Rep. 627). It is unnecessary to determine at this time whether such ruling is correct or not. We do not think that the position of Redman is analogous to the position of the telegraph operator in transmitting the orders of a train dispatcher to the trainmen. There is nothing in this case that shows that it was not just as convenient to place the donkey engine and winch in a position where the men in charge could have governed their action by the direct signals of the foreman, as to place them where they were placed. Train dispatchers must, of necessity, transmit their orders by telegraphic messages. There is a clear distinction between the situation of a local telegraph operator in his relation with the trainmen, and Redman in his relation with Sroufe. The citations hold that the train dispatcher is a vice principal, and that his negligence is binding on the master. The citations are all upon the negligence of the local operator at a distance, and away from the personal sight and touch of the dispatcher, and where it is impossible, from the nature of the business, for the dispatcher to exercise personal supervision, but are a practical affirmance of the proposition that if the negligence was of the operator in the office of the dispatcher, or under his personal supervision, then such negligence is the negligence of the dispatcher. The citations are particular in laying stress upon the servant as the local operator at a distance from the dispatcher. The reason for the distinction is obvious. The rule has existence in the fact that conductors, engineers, and brakemen, when they are in the employment of the railroad company, take notice that orders must come through the local telegraph operator at the station, and that they incur the risk of accidents through his negligence or mistake. The special orders in the first instance are transmitted by the train dispatcher. It is obviously impossible for him to give per-

sonal notice to all who are to be governed thereby, and the orders must of necessity be conveyed to some one in behalf of the others. Hence it is held by these citations that the local telegraph operator is a fellow servant of those who are in control and management of the train. Even on this proposition there are many conflicting authorities. This rule would have no force if the train dispatcher were present and gave the order direct to the local telegraph operator in person, or could have placed himself in a situation to give it in person.

The court instructed the jury as follows:

"I further instruct you, gentlemen, that, in the raising of the cant in question, whatever was necessary or needful or useful in order to raise the cant in an ordinarily safe manner, and consistent with the care and caution necessary to render safe and free from danger the workmen engaged in it, are instrumentalities or appliances, within the meaning of the law, whether the same be ropes, engines, platforms or staging, or servants; and it is the duty of the master, or its vice principal or yard foreman having charge of the raising of this cant, to furnish all such necessary instrumentalities and appliances, whether ropes, machinery, staging, or servants, and that they shall be reasonably suitable and competent."

This is assigned as error. The appellant claims that this instruction makes the master the insurer or guarantor of the servant's carefulness at all times, no matter how careful the master has been in the selection of his employees. It claims that the error in the instruction is twofold: First, there was no claim in the pleadings that Sroufe had been required to work with an incompetent fellow servant, and this instruction is therefore outside the issues, and must have tended to confuse and mislead the jury; and, secondly, that it does not correctly state the law, as the master is not bound at all hazards to furnish his servants with compe-

tent fellow servants; he is only bound to use reasonable care
in the selection of servants, and reasonable care in the re-
tention of them.    If the instruction stood alone, there
would be ground for the criticism.   But the court also told
the jury, in other portions of his instructions, that "the
care required by the master in selecting competent em-
ployees is commensurate with the care required in selecting
adequate machinery"; and the court, in instructing as to
the care required in selecting machinery, in effect told the
jury that it was the duty of the master to use reasonable
care to provide his employees with suitable instrumentali-
ties and appliances, and to keep them in reasonably safe
condition, and to provide his employees with a reasonably
safe place in which to work.   Taking all the instructions
together, the court told the jury that it was the duty of the
master to provide all necessary appliances, including serv-
ants, and that they were to be reasonably suitable and com-
petent; and he, in effect, told the jury that the master had
discharged his duty in this respect when he had exercised
reasonable care to provide such.   We think that this is a
correct statement of the law.   The instructions, taken as a
whole, show that the court told the jury it was the duty of
the master to furnish reasonably suitable and safe machin-
ery, appliances, and servants, and that the defendant dis-
charged this duty when it had exercised ordinary and reas-
onable care in so doing.

As to the contention of the appellant that this was beyond
the pleadings, the pleadings alleged carelessness and negli-
gence in the vice principal in the arranging of his appli-
ances; and if the vice principal was thus incompetent, from
which the jury might infer that he was, and if Redman
was in the discharge of the duty by the master to the serv-
ant, his incompetency was likewise within the pleadings.
But we think that the use of the word "servant" in the in-

struction did not mislead the jury, and it was not contrary to law, and was applicable under the facts in this case.

"An instruction must always be construed in the light of the evidence in the particular case in which it is given, and, if applicable to the evidence of that case, it will not be held erroneous, even though conditions may be conceived where it would not be a correct statement of the law." *Allend v. Spokane & N. Ry. Co.*, 21 Wash. 324 (58 Pac. 244).

The court instructed as follows:

"Mere negligence on the part of the deceased, or of the fellow workmen or colaborers, will not be sufficient to prevent recovery by plaintiff for injury caused by the negligence of the defendant. You must find from the preponderance of the testimony that the negligence of the deceased or his fellow servant, if any, was not remote, but was the proximate cause, or proximately contributed to the death of the deceased. Where the negligence of a fellow servant is combined with the negligence of the master, and this combined negligence causes an injury, the company is liable."

This is assigned as error. The error contended for is in the following language: "Mere negligence on the part of the deceased . . . is not sufficient to prevent recovery . . . for injury caused by the negligence of the defendant." The appellant contends that this is an instruction as to comparative negligence, and, as the doctrine of comparative negligence does not obtain in this state, that it is erroneous. We have read with care every word of testimony in this case. There is not a particle of evidence of negligence on the part of the deceased. There is no evidence from which the jury could infer such negligence. Hence mere reference to negligence on the part of the deceased in the instruction, if error, was harmless. The instruction is simply to the effect that where the negligence of a fellow servant is combined with the negligence of the

master, and this combined negligence causes an injury, the master is liable. This is a correct statement of the law. *Grand Trunk Ry. Co. v. Cummings,* 106 U. S. 700 (1 Sup. Ct. 493) ; *Towns v. Vicksburg, etc., R. R. Co.,* 37 La. Ann. 630 (55 Am. Rep. 508) ; *Ellis v. New York, etc., R. R. Co.,* 95 N. Y. 546.

At the close of the respondent's testimony the appellant challenged the sufficiency of the evidence, and moved the court to take the case from the jury and direct a verdict for the defendant. This motion was denied. The motion was renewed at the close of the entire testimony and denied. The refusal of the court to grant these motions is assigned as error. The evidence at the close of the respondent's testimony tended to show that the knot in the rope fouled the rope; that the rope ran over the top of the spales; that it was negligence to use the rope with the knot in it in that way; that, when the cant would not come down to its place, the foreman, Monk, took hold of the fall and threw his weight upon it to pull it down; that this released the knot, causing the cant to fall and knock down the staging on which Sroufe stood. Matthewson, engineer at the donkey engine, testified, in substance, that, after the cant had been hoisted, they had been lowering according to signal gradually for two minutes or so, during which time the rope responded and paid out. Then it ceased to pay out. The signal for slack continued for two or three minutes longer, during all of which time the slack was being paid out in obedience to the signal, and being piled upon the wharf underneath the platform. At least fifteen or twenty signals for slack were given while it was thus being paid out and piled up. Finally Redman gave the signal "All gone," or "Let go," and immediately went aft. At this time many feet of the rope were piled upon the wharf. Two or three minutes after Redman went aft, the cant fell. The evi-

26—28 WASH.

dence tends to show that Redman's last signal was, "All gone." Monk then took hold of the rope and pulled, and at the same time told the deceased, who was upon the upper staging, to take a bar and pinch away from the harping the top of the cant. Sroufe looked up at the block. Monk hallooed, "Never mind the rope," and commenced pulling on it towards him to get some slack. The cant commenced to slide, and all at once "away she went." Monk stated to Sroufe, the brother of the deceased, shortly after the accident, that they had considerable trouble with the cant, and things did not go right; that he had been calling for slack, and could not get it; that the cant hung quite a little while, but would not come down; and that he thought he might get a little slack by pulling on—surging on—the rope, and he took hold of it, and as he surged on the rope it went with a rush. Monk further stated to this witness that there was a knot in the rope, and the knot might have fouled or caught something. It is true that the testimony fails to show directly and positively that the fouling of the knot caused the accident. From the evidence, however, this may reasonably be inferred. As was said by us in the case of *Abrams v. Montana & Seattle Ry. Co.*, 27 Wash. 507 (68 Pac. 78), where there was no direct proof that the fire that caused the injury complained of escaped from the passing engine:

"The respondent was not obligated to prove these facts by the direct evidence of an eyewitness, nor by proofs which would leave them beyond the possibility of a doubt. It was sufficient if he established them by the proof of circumstances which lead reasonably to their inference, and which ordinarily satisfies an unprejudiced mind of their truth."

This language, we think, can be applied to the facts in this case; and the jury would be warranted in believing

from the evidence that the rope fouled, and held the cant in place, and that it would not have fouled but for the knot in it, and that by reason of the slack being out, and the weight of Monk thrown upon the rope, the knot was suddenly loosened, thereby causing the cant to fall, knocking down the platform upon which the deceased was at work, and thereby causing his death. We do not think, therefore, that the court erred in denying a motion for nonsuit. The testimony of the appellant tended to show that the rope ran under the spales; that, if it ran over the top of the spales, it was liable to foul. The testimony also tended to show that, if the rope ran under the spales, it might have fouled on the wharf, or on one of the shores. The use of the rope with the knot in it, under the circumstances of this case, as a matter of negligence, was for the jury. We do not think, therefore, that the court erred in denying these motions.

The judgment of the court below is affirmed, with costs to the respondents.

REAVIS, C. J., and HADLEY, MOUNT, FULLERTON, ANDERS, and DUNBAR, JJ., concur.