[No. 4626. Decided September 28, 1905.]

ISAAC A. DOSSETT, *Respondent,* v. ST. PAUL & TACOMA LUMBER COMPANY, *Appellant.*[1]

MASTER AND SERVANT—NEGLIGENCE—VICE PRINCIPAL AND FELLOW SERVANTS—SAWYER IN CONTROL OF CREW—SAFE PLACE—DUTY TO WARN OF DANGER RENDERING PLACE UNSAFE. A sawyer in control of a saw crew is a vice principal with reference to the duty to warn one of his crew, a log deck man, as to the danger arising from the operation of the machinery, where it appears that the log deck man was in plain view of the sawyer near a nigger slot with no means of knowing that the place was about to be rendered dangerous by the operation of the nigger, a powerful machine operated by steam for the purpose of pushing heavy logs on to the saw carriage; as it is an imperative duty of the master in furnishing a safe place to give warning of the act of a superior servant in control of machinery which would injure an inferior servant without opportunity on his part of self protection or escape.

    SAME—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY. The question of the contributory negligence of a servant, employed as a log deck man in a mill, and injured by the act of the sawyer in putting the machinery in operation while he was in a dangerous position, near or about to reach over a nigger slot in the discharge of his duties, is for the jury, where the evidence was conflicting as to whether he was at the time necessarily in such a position in the proper discharge of his duties.

    SAME—CONTRIBUTORY NEGLIGENCE—TWO METHODS OF DOING WORK— SAFE PLACE—RENDERED UNSAFE BY ACT OF VICE PRINCIPAL. A servant cannot be said to be guilty of contributory negligence as a matter of law in electing to place himself over a nigger slot in a log deck in a sawmill, when he might have gone around the slot, where it was safe to place himself over the slot when the nigger was not in operation, and the place would become unsafe only by the action of the sawyer in operating the machinery.

1Reported in 82 Pac. 273.

SAME—INCOMPETENCY OF FELLOW SERVANT—EVIDENCE OF NEGLI-
GENCE ON PRIOR OCCASION—ADMISSIBILITY. In an action for personal
injuries sustained through the negligence of a coservant alleged to
be a vice principal, and habitually negligent and careless, evidence
is admissible of a specific act of incompetence upon the part of such
coservant, at which time he had injured one of his men and which
was generally discussed about the mill, and also that he was cross
and irritable toward the men under him.

APPEAL—REVIEW—HARMLESS ERROR. Error in refusing to strike
out evidence of other acts of negligence on the part of a coservant
alleged to be incompetent, is harmless where the court fully and
fairly instructed the jury as to what questions of negligence they
might consider, and the question of the incompetence of such co-
servant was not one of them.

SAME—EVIDENCE—EXPERT WITNESS—DUTIES OF SAWYERS—CUSTOM
IN OTHER MILLS—ADMISSIBILITY. In an action for personal injuries
sustained by an employee upon a log deck of a mill, through the
act of the sawyer in operating the machinery while the plaintiff was
reaching over the nigger slot, it is admissible for expert sawyers to
testify as to the duty of the sawyer under such circumstances, and
to state the custom and rules adopted in other mills of the same
kind and capacity.

Appeal from a judgment of the superior court for Pierce
county, Chapman, J., entered November 22, 1902, upon
the verdict of a jury rendered in favor of the plaintiff for
$7,500 for personal injuries sustained by a log deck man
employed in defendant's mill. Affirmed.

*Reynolds & Griggs* and *Stiles & Doolittle,* for appellant,
contended, among other things, that the employee is bound to
keep a lookout for himself and guard against manifest dan-
gers. *Morgan v. Carbon Hill Coal Co.,* 6 Wash. 577, 34
Pac. 152, 722; *Jennings v. Tacoma R. etc. Co.,* 7 Wash. 275,
34 Pac. 937; *Schulz v. Johnson,* 7 Wash. 403, 35 Pac. 130;
*Cooney v. Great Northern R. Co.,* 9 Wash. 292, 37 Pac. 438;
*Olson v. McMurray Cedar Lum. Co.,* 9 Wash. 500, 37 Pac.
679; *Pugh v. Oregon Imp. Co.,* 14 Wash. 331, 44 Pac. 547,
689; *Anderson v. Inland Tel. etc. Co.,* 19 Wash. 575, 53
Pac. 657, 41 L. R. A. 410; *French v. First Ave. R. Co.,*
24 Wash. 83, 63 Pac. 1108. Under the circumstances, there

was no duty to warn, as that would make the master an insurer. *Mikolojczak v. North American Chem. Co.,* 129 Mich. 80, 88 N. W. 75; *Johnson v. Portland Stone Co.,* 40 Ore. 436, 67 Pac. 1013, 68 Pac. 425; *Siddall v. Pacific Mills,* 162 Mass. 378, 38 N. E. 969; Bailey, Personal Injuries, § 2706. The master is not liable for the negligent use, or for the failure to use, the appliances furnished, no matter what may be the grade of the employee whose business it is to use them. *Baltimore etc. R. Co. v. Baugh,* 149 U. S. 368, 13 Sup. Ct. 914, 37 L. Ed. 772; *Northern Pac. R. Co. v. Hambly,* 154 U. S. 349, 14 Sup. Ct. 983, 38 L. Ed. 1009; *Central etc. R. Co. v. Keegan,* 160 U. S. 259, 16 Sup. Ct. 269, 40 L. Ed. 418; *Northern Pac. R. Co. v. Peterson,* 162 U. S. 346, 16 Sup. Ct. 843, 40 L. Ed. 994; *Northern Pac. R. Co. v. Charless,* 162 U. S. 359, 16 Sup. Ct. 848, 40 L. Ed. 999; *Alaska etc. Min. Co. v. Whelan,* 168 U. S 86, 18 Sup. Ct. 40, 42 L. Ed. 390; *Weeks v. Scharer,* 49 C. C. A. 372, 111 Fed. 330; *Hanna v. Granger,* 18 R. I. 507, 28 Atl. 659; *Kelly v. New Haven Steamboat Co.,* 74 Conn. 343, 50 Atl. 871, 92 Am. St. 220, 57 L. R. A. 494; *Knutter v. New York etc. Tel. Co.,* 67 N. J. L. 646, 52 Atl. 565; *Milhench v. Jenckes Mfg. Co.,* 24 R. I. 131, 52 Atl. 687; *Lepan v. Hall,* 128 Mich. 523, 87 N. W. 619; *Hawk v. McLeod Lum. Co.,* 166 Mo. 121, 65 S. W. 1022. Upon the issue as to the competency of the sawyer, a single instance of negligence could not support a charge of habitual negligence, which must be established where there is no evidence of the master's knowledge. *Michigan Cent. R. Co. v. Dolan,* 32 Mich. 510; *Michigan Cent. R. Co. v. Gilbert,* 46 Mich. 176, 9 N. W. 243; *Peaslee v. Fitchburg R. Co.,* 152 Mass. 155, 25 N. E. 71; *Baulec v. New York etc. R. Co.,* 59 N. Y. 356; *Mayor etc. v. War,* 77 Md. 593, 27 Atl. 85; *Lee v. Detroit Bridge etc. Works,* 62 Mo. 565; *Baltimore Elev. Co. v. Neal,* 65 Md. 438, 5 Atl. 338; *Holland v. Southern Pac. R. Co.,* 100 Cal. 240, 34 Pac. 666; Wharton, Negligence, § 238; Bailey, Personal Injuries, §§ 1505-1525. Where there are two ways of doing a duty, the

one safe, and the other fraught with danger, if the servant voluntarily elects the dangerous way and gets hurt, he cannot recover. *Watts v. Hart,* 7 Wash. 178, 34 Pac. 423, 771; *Jennings v. Tacoma R. etc. Co.,* 7 Wash. 275, 34 Pac. 937; *Hoffman v. American Foundry Co.,* 18 Wash. 287, 51 Pac. 385; *Malmstrom v. Northern Pac. R. Co.,* 20 Wash. 195, 55 Pac. 38; *Reynolds v. Northern Pac. R. Co.,* 22 Wash. 165, 60 Pac. 120; *Beltz v. American Mill Co.,* 37 Wash. 399, 79 Pac. 981. Where the danger is not known to the master, and in reason could not have been known, or reasonably anticipated, and where it arises suddenly and unexpectedly in the performance of details of the work, there is no duty on the part of the master to give warning. *Week v. Fremont Mill Co.,* 3 Wash. 629, 29 Pac. 215; *Hogele v. Wilson,* 5 Wash. 160, 31 Pac. 469; *Wilson v. Northern Pac. R. Co.,* 31 Wash. 67, 71 Pac. 713; *Olson v. McMurray Cedar Lum. Co.,* 9 Wash. 500, 37 Pac. 679; *Cully v. Northern Pac. R. Co.,* 35 Wash. 241, 77 Pac. 202. The liability of the master does not depend upon the grade or rank of the employee whose negligence, if any, caused the injury, but is to be determined by the character of the act from which the injury arises. *Crispin v. Babbitt,* 81 N. Y. 516; *Sayward v. Carlson,* 1 Wash. 29, 23 Pac. 830; *McDonough v. Great Northern R. Co.,* 15 Wash. 244, 46 Pac. 334; *Hammarberg v. St. Paul etc. Lum. Co.,* 19 Wash. 537, 53 Pac. 727; *Rush v. Spokane Falls etc. R. Co.,* 23 Wash. 501, 63 Pac. 500; *Shannon v. Consolidated etc. Min. Co.,* 24 Wash. 119, 64 Pac. 169; *Sroufe v. Moran Bros. Co.,* 28 Wash. 381, 68 Pac. 896; *Czarecki v. Seattle etc. Nav. Co.,* 30 Wash. 288, 70 Pac. 750.

*Ellis & Fletcher,* for respondent, in addition to many of the cases cited by counsel in the case of *O'Brien v. Page Lumber Co.,* 39 Wash. 537, 82 Pac. 114, cited, *inter alia, Shannon v. Consolidated etc. Min. Co.,* 24 Wash. 119, 64 Pac. 169; *Sroufe v. Moran Bros. Co.,* 28 Wash. 381, 68 Pac. 896; *Costa v. Pacific Coast Co.,* 26 Wash. 138, 66 Pac. 398; *Arm-*

*strong v. Oregon Short Line etc. R. Co.,* 8 Utah 420, 32 Pac. 693; *Burlington etc. R. Co. v. Crockett,* 19 Neb. 138, 26 N. W. 921; *Anderson v. Northern Mill Co.,* 42 Minn. 424, 44 N. W. 315; *Erickson v. St. Paul etc. R. Co.,* 41 Minn. 500, 43 N. W. 332, 5 L. R. A. 786; *San Antonio etc. R. Co. v. McDonald* (Tex. Civ. App.), 31 S. W. 72; *Hannibal etc. R. Co. v. Fox,* 31 Kan. 586, 3 Pac. 320; *Union Pac. R. Co. v. Geary,* 52 Kan. 308, 34 Pac. 887; *Davis v. New York etc. R. Co.,* 159 Mass. 532, 34 N. E. 1070; *Promer v. Milwaukee etc. R. Co.,* 90 Wis. 215, 63 N. W. 90, 48 Am. St. 905; *Schroder v. Chicago etc. R. Co.* 108 Mo. 322, 18 S. W. 1094, 18 L. R. A. 827; *Norton Bros. v. Nadebok,* 190 Ill. 595, 60 N. E. 843, 54 L. R. A. 842; *Shumway v. Walworth etc. Mfg. Co.,* 98 Mich. 411, 57 N. W. 251; *Wilson v. Northern Pac. R. Co.,* 31 Wash. 67, 71 Pac. 713; *Bailey v. Cascade Timber Co.,* 32 Wash. 319, 73 Pac. 385; *Grout v. Tacoma Eastern R. Co.,* 33 Wash. 524, 74 Pac. 665; *Gaudie v. Northern Lum. Co.,* 34 Wash. 34, 74 Pac. 1009; *Morrison v. Northern Pac. R. Co.,* 34 Wash. 70, 74 Pac. 1064; *Bailey v. Cascade Timber Co.,* 35 Wash. 295, 77 Pac. 377; *Jancko v. West Coast Mfg. etc. Co.,* 34 Wash. 556, 76 Pac. 78; *Flanders v. Chicago etc. R. Co.,* 51 Minn. 193, 53 N. W. 544; *Mullin v. Northern Pac. R. Co.,* 38 Wash. 550, 80 Pac. 814; *Sandquist v. Independent Tel. Co.,* 38 Wash. 313, 80 Pac. 539; *Evans v. Louisiana Lumber Co.,* 111 La. 534, 35 South. 736; *Hendricks v. Lesure Lumber Co.,* 92 Minn. 318, 99 N. W. 1125, 100 N. W. 638.

MOUNT, C. J.—Respondent brought this action against the appellant to recover for personal injuries. The cause was tried to the court and a jury, which returned a verdict in favor of the plaintiff for $7,500. The defendant appeals from a judgment on the verdict.

At the trial there was very little dispute upon the facts in the case, which are substantially as follows: The appellant owns and operates a lumber manufacturing plant, in Ta-

coma, at which plant a large number of men are employed. These men were divided into gangs of men at the several departments of the work. Moses La Faw was foreman of the mill, and hired and discharged all employees. There was a superintendent over Mr. La Faw. At what is called the head of the mill were two large band saws, where the logs from the mill pond were received, and from which the lumber as cut passed through various operations in the mill until it was finally carried out into the yards. Each of the gangs of men had one principal man who had charge of the men in the gang, and who gave working directions when necessary. Usually each man knew his duties after his first instructions, and performed them without special direction.

At what was called the "short side" of the saw mill, James McAnally had charge of a gang of five men, whose duties were to operate one of the saws and cut logs into lumber. Mr. McAnally was the "head sawyer," known as such by reason of the fact that the logs first came to his saw. His duties were to operate the saw and machinery necessary to pass the logs into the saw, and also to direct the men working with him. These men were under his direction and control, and bound to obey his orders. They were hired and discharged upon his request, by the foreman, Mr. La Faw.

The respondent, Dossett, was one of the gang of men under Mr. McAnally, and was known as the "log deck man." The log deck was about eighteen feet wide, and about fifty feet long, north and south. On the east side of the log deck, were the rolls upon which logs came up into the mill from the mill pond. The saw carriage was to the west of the log deck, which was slightly inclined from the rolls, on the east, to the saw carriage, on the west. This saw carriage was operated back and forth, northerly and southerly, at the will of the sawyer. On the saw carriage were two, and sometimes three, men who stood behind the

log and set iron dogs into the log, so as to hold it steady on the carriage, and so as to change its position from time to time as required.  The sawyer operated the saw carriage by means of a lever, at the northwest corner of the log deck, close to the saw.  Immediately over the saw carriage were two friction rollers, one of which was operated by an overhead lever, just behind the sawyer at the north end of the log deck, and the other roller was operated by a similar lever at the south end of the log deck, which lever was operated by one of the carriage men.  The sawyer's pit was a little lower than the log deck, and near the saw.

In the floor of the log deck were three large slots, about two feet wide, extending at right angles from the saw carriage into the log deck.  The first and third of these slots were about six feet long; the second was about ten feet long.  The first of these slots was about ten feet south from the sawyer, the second about sixteen feet, and the third about twenty-three feet south.  In the first and third of these slots were what were called, "push arms," which were iron castings which worked on a hinge, and when not in use rested in the slots.  These push arms were used for the purpose of pushing logs on to the carriage.  The middle slot, which was the largest, having a length of about ten feet, was occupied by what was called the "nigger," or Simonson log roller.  The body of the nigger was about the same shape as the push arms, but it had a large hinged hook on the top end of it, which hook could be used to pull a log from the carriage, while the push arms and the nigger itself were used to push or strike logs into position. When not in use, this hook folded down into the face of the nigger.  When the nigger was not in use, it rested in the slot in the log deck, the same as the push arms.

These push arms and nigger were operated solely by the sawyer, by means of a single lever, held in his left hand, at his station in the saw pit.  The movements of this lever were so arranged that the sawyer could either throw up

the push arms and the nigger together, or throw up the push arms alone, or throw up the push arms and nigger and extend the hook forward over a log all at the same time. The nigger, however, could only be raised part of the way up, unless the push arms were already up, or were raised with it. The push arms and nigger constituted a very powerful machine by means of which the largest logs could. be handled with the greatest ease, the motive power being steam, and the nigger having an independent piston capable of driving it against a log with great force. These push arms and nigger were used for placing logs on the saw carriage after the logs were placed within reach of them. The nigger was used only when the push arms were insufficient.

Across the floor of the log deck, and at right angles to the saw carriage, were skids of iron, about four inches high and a few feet apart, for logs to roll upon. One of these skids was about two feet from the nigger slot towards the sawyer's pit, and parallel with it. It was Mr. Dossett's duty to roll logs from the log deck on to the saw carriage, or within reach of the push arms. When the time came for a log to be placed upon the saw carriage, Mr. Dossett was required to wrap a chain around the log on the log deck, fasten one end of the chain, on which was a swamp hook, into the log, and hook the link on the other end of the chain into a chain on the overhead friction roller. Then, by means of the lever near the sawyer, he rolled the log down to the saw carriage, or within reach of the push arms. Sometimes logs were placed on the saw carriage without the use of the push arms. When the chain on the log was no longer needed to place the log on the carriage, it was Dossett's duty to remove the chain from the log as speedily as possible, and make ready for another log when needed. He had been working around the mill for about four years, but had been filling the position of log deck man about three weeks, only, at the time of his injury. He had been requested by

the sawyer to be more prompt in getting his chain off the logs.

At the time of the accident, a log about thirty-six feet long, and about four feet in diameter, was being rolled down by respondent from the log deck on to the saw carriage, by means of the friction roller operated by the lever behind the sawyer. This log was larger at one end than at the other, and did not come squarely on to the carriage. Mr. McAnally thereupon directed respondent to stop the use of that roller, and to change the position of the chain, and to attach it to the other roller. At the same time, Mr. McAnally directed Mr. Giese, one of the doggers, to go to the friction roll at the south end of the log deck, and operate that lever so as to roll the log down. By this rear lever, the log was rolled further down, but would not go upon the carriage as required.

Mr. McAnally thereupon brought up the push arms to drive the log into position. Respondent then went up to the log for the purpose of removing the chain. He was standing with his back toward the sawyer, and by the side of the slot in which the nigger lay. Mr. Giese gave the chain some slack so that it could be removed. Respondent thereupon placed his back to the log and reached across the line of the nigger slot to jerk the chain loose from the log. At the instant he did this, Mr. McAnally brought up the nigger, which struck respondent on his side and stunned him, so that he fell or slid down, with his arm crossing the nigger which was still pushing against the log, so that the blade of the hook crushed his arm practically off near the shoulder. The arm was immediately afterwards amputated. Respondent was in plain view of Mr. McAnally, about twenty feet from him, and Mr. McAnally was looking in the direction of respondent. He could have readily seen him. The foregoing facts are not disputed.

There was some evidence to the effect that respondent was not supposed to remove the chain until the doggers had

set their dogs, and that, until this was done, and while the
push arms were up, the sawyer was at liberty to use the
nigger, and if the push arms were not sufficient to place the
log in its proper position on the carriage, the nigger was
then put into use. There was some evidence to the effect
that, when the push arms were in use, it was respondent's
duty to immediately remove the chain, unless ordered not
to do so by the sawyer.

A demurrer to the complaint was denied, and at the con-
clusion of plaintiff's evidence, defendant's motion for a non-
suit was also denied, appellant contending then, as it does
now, that the allegations of the complaint and the facts
proven and admitted on the trial show, as a matter of law,
that the respondent and the sawyer McAnally were engaged
in a common employment as fellow servants, and each was
bound to know what the other was doing, and bound to
look out for his own safety, and that there was no duty
of the master to warn one servant against the conduct of
a fellow servant. This same question was also presented
to the lower court upon a motion for a new trial after
verdict.

Since the appeal in this case, and since the arguments
of counsel, we have recently had the same question under
consideration in the case of *O'Brien v. Page Lumber Co.,*
39 Wash. 537, 82 Pac. 114, which was a case similar in
all its essential features to this case, and we there held
that the sawyer was a vice principal, upon whom rests the
duty to warn a servant in a dangerous place, known, or
which should have been known, by the sawyer, and unknown
by the servant to be such, and that a failure of the sawyer
to give warning under such circumstances is negligence of
the master. This is not a new doctrine, and is based upon
humanity and sound reason. The sawyer is in command
and control of the servant, who is bound to obey. The
sawyer sees and knows the position of the servant, who is

in the active discharge of his duties. The sawyer, alone, knows of an agency which he may or may not put into operation, which agency, when in operation, becomes dangerous and makes the place of the inferior servant dangerous. When such servant does not know, and has no means of knowing, the danger of the place, it is the imperative duty of the master to warn him thereof. This duty cannot be delegated so as to relieve the master of liability. To hold otherwise would relieve the master of his duty to furnish a reasonably safe place for the servant, and would permit a superior servant in control to take the life or limb of such inferior servant, without an opportunity for self-protection or escape. Neither the law nor the dictates of humanity permit such results. *Nelson v. Willey Steamship & Navigation Co.,* 26 Wash. 548, 67 Pac. 237; *Costa v. Pacific Coast Co.,* 26 Wash. 138, 66 Pac. 398; *Shannon v. Consolidated etc. Min. Co.,* 24 Wash. 119, 64 Pac. 169; *Uren v. Golden Tunnel Min. Co.;* 24 Wash. 261, 64 Pac. 174; *Sroufe v. Moran Bros. Co.,* 28 Wash. 381, 68 Pac. 896; *Wilson v. Northern Pac. R. Co.,* 31 Wash. 67, 71 Pac. 713.

Upon the question of contributory negligence, we are satisfied after examining the evidence that there was no question for the court. The evidence was conflicting upon that point. It was a question, therefore, for the jury. Appellant invokes the rule in this case that, where there are two ways of doing a duty, one safe and the other dangerous, if the servant elects the dangerous way and is injured, he cannot recover, and cites authorities to that effect; and in that connection argues that the respondent could have walked around the nigger, instead of reaching across the plane of its action, and if he had done so, would not have been injured. It is sufficient to say, upon this point, that there was no apparent danger in reaching or stepping across the plane of the action of the nigger. While the nigger rested

in its slot, and was not in use, there was no· more danger
in reaching across than there was in walking around. The
place was apparently safe. It was, in fact, safe when re-
spondent chose that way. There was no real danger unless
the sawyer should put the nigger in operation. When he
did so, the place became dangerous, but not until then. There
was evidence to the effect that it was customary to cross this
slot when the nigger was not in use; that, as soon as the
push arms were up, it was respondent's duty to remove the
chain, unless directed otherwise. He was not directed to
leave the chain upon this occasion. If this evidence was
true, respondent was justified in being where he was, and
also in believing that the place was safe. This question
was therefore one for the jury. The rule contended for can-
not apply where both ways are safe.

It is argued, also, that the signal to remove the chain
was the act of the doggers in setting their dogs. There
was evidence to this effect, but this evidence was also dis-
puted, as stated above. This fact was one for the jury, and
not for the court, to find.

The complaint alleged that the sawyer was incompetent
and habitually negligent and careless, and that the same
was known to the appellant, and unknown to the respondent.
It is also alleged that appellant was negligent, because it
failed to provide a safe place for respondent to work, or
safe methods and regulations. Appellant moved to strike
out these paragraphs, which motion was denied. At the
trial, the court permitted evidence to be introduced to the
effect that, upon one occasion, about a month before the
injury complained of in this case, Mr. McAnally, the sawyer,
injured one of his men slightly, and narrowly averted a
serious accident, which was generally discussed about the
mill; and, also, evidence to the effect that McAnally was
cross and irritable toward the men under him. The court
refused to strike this evidence out of the case, and appellant

urges these rulings as error. We said, in *Green v. Western American Co.,* 30 Wash. 87, 70 Pac. 310:

"Specific acts of incompetency of the pit boss were admissible in evidence under the general allegation that the pit boss was ignorant and incompetent, and under this allegation evidence was admissible that the pit boss did not have regard for the lives of the men under his charge, etc."

Under this rule, the allegations in the complaint were sufficient, and the evidence offered was competent, and it was therefore not error to deny the motion to strike out the paragraphs of the complaint or to strike out the evidence. We are, however, of the opinion that there was not sufficient in this evidence to sustain a finding of negligence against appellant upon these grounds alone. If this were the only evidence of negligence in the case, we should not hesitate to dismiss the action. But there was clearly sufficient evidence upon other grounds hereinbefore discussed, and we are further clearly of the opinion that, if the court erred in refusing to strike this evidence, such error was harmless, because the court clearly and fairly instructed the jury as to what questions of negligence they might consider under the evidence, and the incompetency of the sawyer was not one of them.

Appellant also contends that the court erred in permitting three witnesses, who had been employed for a long time as sawyers in other mills, to testify as to the duties of sawyers under circumstances surrounding this accident. The testimony was in corroboration of witnesses who had already stated what were the rules in appellant's mill at the time of the accident. It is no doubt true that customs or rules in one mill are not necessarily the customs or rules adopted in others of the same kind and capacity, but we think it was not an abuse of discretion on the part of the trial court to receive evidence of this kind (*Traver v. Spokane St. R. Co.,* 25 Wash. 225, 65 Pac. 284), because reasonable rules and customs in mills of the same kind and capacity

are generally the same, unless special conditions render different rules necessary or more convenient and adaptable. There was no error in receiving the testimony of these witnesses. Appellant in its briefs makes numerous objections to the instructions which the court gave to the jury. The most important of these objections are covered by what we have already said. We do not deem the other objections of sufficient merit to justify further discussion. It is sufficient to say that the instructions given by the court fully and fairly covered every theory of the case, and were as favorable to the appellant as could safely be given.

We find no reversible error in the record. The judgment is therefore affirmed.

HADLEY and DUNBAR, JJ., concur.

CROW, J., concurs in the result.