## Illinois Steel Co. v. Antonino Ostrowski, Adm'x.

```
93      57
a194s  376

93      57
107    1499
```

1. VERDICTS—*When the Recorded Verdict Controls.*—Where a paper purporting to be a verdict, and to be signed by the jurors, appears in the record, and is signed by a juror whose name does not appear in the original record, but the trial court, finding that he was impaneled as a juror, and that the mistake in the record was a misprision of the clerk, made an order amending the record accordingly, and the common law record showed that the jury which was impaneled rendered the verdict, *it was held* that the recorded verdict and not the paper purporting to be such must control.

2. DAMAGES—*Evidence as to the Measure of Damages Improperly Admitted—Harmless Error.*—Where evidence tending to increase the measure of damages is improperly admitted, but the court in instructing the jury directs them in assessing the damages not to allow anything for the kind of damages referred to in the evidence improperly admitted, and instructs them as to the proper measure of damages in the case, the error is harmless, unless it appears from the verdict that the jury were misled by the admission of such evidence.

3. SAME—*When Not Affected by the Death of the Plaintiff.*—When a plaintiff in an action for personal injuries dies, pending his suit, and his personal representative is substituted in his stead, the damages to be recovered are not affected by the death of such plaintiff, but are limited to the amount which the preponderance of the evidence shows the deceased suffered prior to his death.

4. SAME—*When $1,000 Is Not Excessive.*—Where a person engaged in operating a hoisting machine for unloading iron ore was injured, and

it appeared from the evidence of the surgeon who examined him about eight days afterward, that he was suffering from a lacerated and contused wound between the small and third finger of the right hand, extending about half an inch by three-quarters, with a fracture of the first and second metacarpal bones, crushing the muscles of the whole back of the hand, a fracture of the outer condyle of the radius and contused bruises of the whole forearm, and the lacerated portions of the hand had to be freely incised, getting from the same about two drams of pus, and in the opinion of the surgeon there would not be a complete recovery from the injury for six or seven months, *it was held* that a verdict for $1,000 was not excessive.

**Trespass on the Case,** for personal injuries. Appeal from the Circuit Court of Cook County; the Hon. CHARLES G. NEELY, Judge, presiding. Heard in this court at the March term, 1900. Affirmed. Opinion filed January 24, 1901.

**Statement.**—June 10, 1897, John Ostrowski, appellee's intestate, was in appellant's employ, and was working in the hold of a vessel assisting in the unloading of iron ore therefrom, when a piece of iron about four inches wide by four inches thick and about three inches long, to which a nut was attached, fell on his right hand from a hoisting apparatus about thirty feet above him, which was being used by appellant in unloading iron ore from the vessel, and injured him. John Ostrowski was drowned February 16, 1898.

Appellee recovered judgment for $1,000, to reverse which this appeal is taken.

Appellee's counsel admit that the following description of the hoisting apparatus, contained in the brief of appellant's counsel, and the manner of his injury, is substantially correct:

" The boat was moored in a slip alongside a wharf. The machinery used for unloading the ore from the vessel was known as a Brown hoist. This hoist consisted of two timbers running parallel with each other from the edge of the dock back at right angles to the margin of the dock several hundred feet onto the land. These timbers were supported on iron structures about thirty feet from the surface of the ground. The distance between these two timbers was about a foot or a foot and a half. From these two timbers, at the margin or edge of the dock, extended two other timbers similar in size and construction, out over the

deck of the vessel. The outer end of these two latter timbers could be moved up and down. The inner ends of these timbers were joined to the fixed timbers upon the land by a hinge, right above the edge of the dock. These timbers, extending from the dock out over the vessel, were called the apron. When a vessel is moored at the dock, the apron is adjusted in the proper position above the hatch of the vessel. On these two timbers of the hoist there were two different devices known respectively as a carriage and a stopper. The carriage is a sort of four-wheel car. Two of the wheels run on each timber of the hoist and the body of the car hangs below the wheels between the timbers of the hoist. The stopper is a device located near the outer end of the apron, which limits the movement of the carriage in the direction of the outer end of the apron. When the carriage moves out to the stopper the stopper causes the tub attached to the carriage to be released from the carriage and permits it to be lowered into the hatch of the boat. The tub into which the ore is loaded has a bail. A hook attached to a block or sheave, hooks into the bail of the tub. The axle running through the wheel in the block or sheave extends about three inches outside of the side of the block or sheave. A cable runs around the wheel in the block or sheave. By means of this cable the block or sheave, with the tub hooked to it, may be drawn up to the carriage. When it reaches the carriage a device in the lower part of the carriage hooks under the axle, which extends beyond the side of the block or sheave, and then the carriage is moved on the apron and hoist to the proper place and the tub is dumped. After the tub is dumped, the carriage is moved back to a point over the hatch of the boat. At this point it strikes the stopper, which releases the block or sheave from the carriage, and the block or sheave with the bucket attached descends into the hatch of the boat. At the time Ostrowski was hurt he was in the hold of the boat and was hooking a loaded tub onto the hook of the block or sheave. A bolt in part of the stopper broke, and one end, with the nut on it, fell and struck him on the hand."

The bolt which broke was part of the stopper, and its location was as follows: The timbers of the apron on which the wheels of the carriage rested, were a foot or a foot and one-half apart. On top of these timbers and extending from one to the other was an iron plate. A similar plate

extended from one timber to the other, on the lower side of the timbers. Through the center of the iron plate and between the timbers there was a bolt, at the lower end of which was a large nut, which, when screwed up, clamped the upper and lower sides of the timbers, thus holding the stopper firmly in place. There were two other iron plates which formed a part of the stopper, which extended perpendicularly down between the timbers of the apron, which latter plates were three or four inches apart, and through them the plates first mentioned passed. The bolt passed through the perpendicular plates. The stopper could be moved from place to place on the apron, to do which it was necessary to loosen the bolt by unscrewing the nut. The bucket and carriage are both made of iron. A witness testified that the former was three feet across and three feet high, and that he thought it weighed three tons, and that the carriage was as high as the witness, and about four feet long. When the carriage ran against the stopper, the bucket which it carried was empty. The evidence with regard to the breaking of the bolt was as follows:

Steeny Pawlowski, a fellow workman of the deceased, testified that the bolt broke right in the thread, right close to the big nut; that half of the break was old and half of it was new, and that the old half was all rust. Peter Albrecht, another fellow workman of the deceased, testified that the bolt that fell down had threads in it like a screw, and that the break occurred right across the bolt where the threads were.

Appellant's counsel introduced no evidence except a photograph showing the vessel and hoisting apparatus.

At the conclusion of the evidence appellant's counsel moved the court to exclude the evidence for the plaintiff and to instruct the jury to find the defendant not guilty, and presented an instruction to that effect, which motion the court overruled.

Kemper K. Knapp, attorney for appellant.

Douthart & Brendecke, attorneys for appellee.

Mr. Presiding Justice Adams delivered the opinion of the court.

Counsel for appellant contends that no negligence of appellant is shown; that the declaration does not state a cause of action; that the verdict was not rendered by the jury sworn and impaneled to try the cause; that incompetent evidence was admitted, and that the verdict is excessive.

It appears from the evidence that the carriage and bucket described in the preceding statement ran down an inclined plane, formed by the lowering of the apron, until arrested by the stopper, and that this occurred each time the empty bucket was conveyed by the carriage to the stopper for the purpose of lowering it into the vessel. There was, therefore, a succession of heavy blows against the stopper, the force of each blow being measured by the momentum of the carriage and bucket.

The stopper, when the ore was being unloaded, was over the hatchway beneath which the men were at work loading ore into the empty bucket, when lowered, and hooking the bucket when filled, onto a hook attached to the hoisting apparatus. Under the circumstances, the jury were warranted in inferring that it was appellant's duty to inspect the hoist frequently, and especially before commencing to unload a vessel. Half the break in the bolt, which was an important part of the stopper, was an old break, as indicated by the fact that it was rusty. The rusty appearance of the old break was evidence that it must have occurred before appellant commenced to unload the vessel which was being unloaded at the time of the accident. The witness who testified to the old break discovered it by merely looking at the bolt. The jury, therefore, were fully warranted in inferring that if there had been proper inspection the old break would have been discovered and the accident would have been avoided.

Appellant's counsel urges that the bolt was covered with grease, and for this reason and because of its location, as above described, it could not be seen. But we regard these circumstances as wholly insufficient to excuse appellant.

Appellant's counsel thus states his objections to the declaration:

There is no allegation that the defendant knew that the piece of iron in question was weak and unsubstantial.

There is no allegation that the defendant, had it used ordinary care, ought to have known that said piece of iron was weak and unsubstantial.

There is no general allegation that the defendant 'negligently did or failed to do anything which caused the accident.' "

The duty of appellant in the premises is thus averred in the declaration:

" It was then and there the duty of the said Illinois Steel Company, defendant, to maintain said tubs, blocks, tackle, hoisting engine and apparatus to start and stop the hoisting of said tubs with ore in them in good order and condition and to have the same properly inspected so as to make sure that said machinery and all parts thereof were in good order and reasonably sufficient in strength, material and form, safely to do the work expected of them, in the hoisting of said ore out of said vessel."

The breach of duty is alleged as follows:

" And complainant alleges that said piece of iron fell because defendant had allowed the same to become old and worn out, corroded with rust and so weak and unsubstantial that it was unfit to be used in and about said business. That defendant neglected to have the said piece of iron inspected so that its defects might have been ascertained and provided against or supplied, so that the injury to the complainant would not have occurred."

The declaration states a cause of action, is good in substance, and not obnoxious to the objections of appellant's counsel. The original record showed that one William H. Mitchwell was one of the jurors impaneled. A paper purporting to be a verdict and to be signed by jurors is in the record and is signed Wm. H. Witherell. The original record did not show a juror of that name. But the trial court found that William H. Witherell and not Wm. H. Mitchwell was impaneled a juror, that the mistake in the original record was by misprision of the clerk, and made an order amending the record accordingly. The common

law record shows that the jury which was impaneled rendered the verdict. The recorded verdict, and not the paper relied on by appellant, controls. Brewing Co. v. Hermann, 88 Ill. App. 285; Auerbach v. Arguelles, 80 Ill. App. 167, and cases there cited.

The witness Peter Albrecht testified in his examination in chief to the earnings of appellee's intestate. Albrecht was one of the men engaged in unloading the vessel. On his redirect examination he was asked how much he, the witness, earned on an average every two weeks, and answered, "Sometimes forty-eight, fifty, fifty-five dollars, every two weeks." We think the question how much this witness earned was irrelevant, but can not perceive how it could prejudice appellee, because the witness testified that the deceased earned in the work he was engaged in, two dollars per hour, and the jury could not have been misled into confusing the earnings of the deceased with those of the witness.

Appellee was permitted to testify, over appellant's objection, that the deceased left him surviving three children, one of whom was about six and another about seven years of age. We think this evidence was improperly admitted. However, the only prejudicial effect which it could have as to the appellant would be to increase the damages, to prevent which the court gave this instruction:

"The jury are instructed that if under the instructions of the court and the evidence in this case they should find the defendant guilty, they should not, in assessing damages in favor of the plaintiff, allow anything for mental suffering, or damages of any kind, pecuniary or otherwise, suffered by the widow or next of kin of the said John Ostrowski, but on the contrary such damages should be limited by the amount of damages which the preponderance of the evidence shows was suffered by the said John Ostrowski prior to his death."

We are of opinion that in view of the foregoing instruction the jury could not have been misled into assessing any damages except such as appellee's intestate would, in the opinion of the jury, have been entitled to recover had he

survived.    In City of Joliet v. Conway, 119 Ill. 489, the court, referring to a similar instruction, say :

"In this case there is no attempt to show that the family were dependent upon the plaintiff for support, care or maintenance, and the jury, we think, could not have so understood it, especially in view of the fact that the instructions expressly limit the right of recovery to such damages as resulted to the plaintiff alone."

The piece of the belt to which the nut was attached, and which is described in the preceding statement, fell from a height of thirty feet on the right hand of the deceased, while he was engaged in hooking a full tub or bucket onto the hoisting apparatus.    The surgeon who attended the deceased and examined his injuries testified as follows :

"The man was suffering from a lacerated and contused wound between the small and third finger of the right hand, extending about half an inch by three-quarters, a fracture of the first and second metacarpal bones of the right hand, crushed muscles of the whole back of the hand, fracture of the outer condyle of the radius, contused bruises of the whole fore-arm, and this examination took place about eight days after the accident.    The lacerated portions of the hand had to be freely incised, getting from same about two drams of pus.    In my opinion there would not be a complete recovery from that injury within the space of six or seven months.    During that time, in my opinion, he would not be able to work with that hand."

Another witness testified that the deceased could not work after the injury.    He was injured on the morning of June 10, 1897.    He was drowned February 16, 1898, more than eight months after the accident, and the evidence tends to show that during that time he was unable to work. We do not consider the damages excessive.    The judgment will be affirmed.