[No. 8237.    *En Banc.*    February 11, 1911.]

LOUIS GROSJEAN, *Respondent*, v. DENNY-RENTON CLAY & COAL COMPANY, *Appellant*.[1]

MASTER AND SERVANT — FELLOW SERVANTS — GIVING OF SIGNALS. The feeder of a brick machine, whose duty it was to signal the pressman for starting the press, is not a fellow servant of a coemployee whose safety depended upon the giving of the proper signals, and the same is a nondelegable duty of the master.

SAME—SAFE PLACE—NEGLIGENCE—ERRONEOUS SIGNALS—CONTRIBUTORY NEGLIGENCE—QUESTIONS FOR JURY. The negligence of the owner of a brick machine, and the contributory negligence of an employee whose duty it was to remove dry clay from the top of the press, while coemployees controlled the machinery, is for the jury, where it appears that the employee was ordered and it was customary for him to put his hands in the press relying upon notice to the feeder, that the pressman never started the press until signaled to do so by the feeder except on starting up in the morning, that the pressman started the press in response to a wrong signal given by the feeder while the employee's hands were in the press, cutting off his hands, and that a stick to be first inserted in the press in such a case for safety was not used, and that the employee had worked but a few months and did not know anything about such stick.

Appeal from a judgment of the superior court for King county, Albertson, J., entered April 8, 1909, upon the verdict of a jury rendered in favor of the plaintiff, in an action for personal injuries sustained by an employee in a tile plant. Affirmed.

*Kerr & McCord* and *Roberts, Battle, Hulbert & Tennant*, for appellant.

*Clay Allen* and *Walter M. French* (*Winter S. Martin*, of counsel), for respondent.

PARKER, J.—The plaintiff seeks to recover damages for personal injuries, which he contends resulted to him from the negligence of the defendant while he was working as a clay mixer in its tile pipe manufacturing plant. The de-

[1]Reported in 113 Pac. 570.

fendant denied the acts of negligence charged against it, and affirmatively pleaded assumption of risk and contributory negligence on the part of the plaintiff and his fellow servant. A trial resulted in a verdict and judgment against the defendant, from which it has appealed.

It was the respondent's duty, among others, to attend a machine situated upon the ground floor, which mixed the clay to the consistency of putty, and then place it upon a conveyor by which it was carried up to the third floor convenient to the press. This conveyor dropped the clay upon a horizontal storage conveyor about eight feet long, which led to the press. This storage conveyor was operated by another employee who was known as the feeder. A short stairway of five steps led from the third floor to the station of the feeder, close to the horizontal conveyor, where he sat facing the press. His duties required him to fill the press from the horizontal conveyor, starting and stopping it as became necessary. When the press was full of clay, the feeder stopped the horizontal conveyor until the clay was exhausted in the press, and the head would then be raised and the press again filled. The press consists of two cylinders, one above the other, the upper one being for steam and the lower one for clay. The piston of the steam cylinder has attached to its lower end a head which fits snugly into the clay cylinder and is forced by the steam down upon the clay, pressing the clay into moulds or dies, under the clay cylinder. The clay cylinder is twenty inches in diameter, and when the head is raised to its highest position there is a space of about twelve inches from the top of the clay cylinder to the head. This enables the clay to be fed into the top of the cylinder from the horizontal conveyor. The clay cylinder extends from a little above the third floor down through that floor into the second story, where the dies are. The press is operated by an employee called the pressman, who is also foreman of the press gang, whose position is near the dies on the second floor. He stands with his hand on the

throttle lever and applies the necessary pressure upon the clay in the cylinder.

It was respondent's duty to take care that no dry clay be carried up, pass into the press, and the head come down upon it, as it would cause trouble and delay, and render the plant idle for a time while such dry clay was being removed. If any dry clay happened to go up on the conveyor it was respondent's duty to follow it up and, if possible, remove it before it passed into the press and the head came down on it. Soon after starting the plant on the morning respondent was injured, he noticed some dry clay start up the conveyor. He immediately ran up stairs for the purpose of intercepting it if possible. He first went to the horizontal conveyor from which the press is fed, and examined the clay there, and not finding the dry clay there, went to the press, the head being up and not in operation, put his hands in the top of the clay cylinder for the purpose of examining the clay there and removing the dry clay if found there, when the the pressman on the second floor turned the steam on, bringing the head down into the clay cylinder, severing both of respondent's hands. These facts are practically undisputed, and will serve to render readily understood the facts bearing directly upon the questions of negligence involved.

It is contended by learned counsel for appellant that the issue upon appellant's negligence involves only the question of the feeder negligently giving to the pressman the wrong signal when respondent had his hands in the press, thereby causing the pressman to start the press. In their brief they state their view of this issue as follows:

"It is alleged that Forey, the feeder, negligently gave to the pressman a signal to start the press while he had his hands in it, and that the pressman did put the press in operation to his injury as alleged. So that the sole question of negligence presented upon this appeal is the allegation that the feeder, Forey, negligently gave a wrong signal to the pressman at a time when the plaintiff was in a position of danger."

We will adopt this theory, though learned counsel for respondent seem to regard the issue as somewhat broader. It is also contended in behalf of appellant that, in any event, the negligence of the feeder in this regard was that of a fellow servant of respondent; while it is contended on behalf of respondent that in giving the signals the feeder was performing a duty which appellant could not delegate and thereby escape the consequence of its negligent performance. These questions are all involved in appellant's general contention that the evidence does not sustain the verdict and judgment. We will now notice the facts bearing directly thereon. The evidence touching these facts was by no means free from conflict, but it tended to show the following:

The feeder and the pressman were stationed on different floors as we have seen, and not within view of each other; neither could the pressman see the feeding conveyor or the press so as to know when to operate or desist from operating it. This rendered it necessary to have a system of signals by which the feeder could communicate to the pressman, since the press must be operated according to the conditions that existed in and about it, and the feeder was the only man at all times conversant with those conditions. For the purpose of so signaling, the feeder had near his station a piece of metal upon which he would strike with a small steel rod so it could be heard by the pressman, almost under him on the second floor. One stroke by the feeder meant for the pressman to operate the press; that is, to bring the head down upon the clay and was always given when the cylinder was full of clay ready to press it into the dies under the cylinder. Two strokes by the feeder meant to raise the head and hold it. Two strokes would also mean to hold the head if it was already up to its highest position, but it was not necessary to give any signal to hold the head if it was already up. The pressman never brought the head down unless signaled so to do by the feeder, except possibly in the morning immediately upon starting of the machinery, before any fresh clay passed

into the cylinder; the purpose being to work out the water accumulated upon the clay left in the press over night, and then the pressman would first rattle a loose rod, which meant to the feeder, or any one near the press, that the press was about to start.   Then after working the head up and down a few times it would be raised, leaving the cylinder open for feeding at the top, and the pressman would wait for a signal, one bell, informing him that the cylinder was full of clay and ready to go ahead.   It is conceded that the head when up would not come down save by the act of the pressman applying the steam, and that he did apply the steam at the time of respondent's injury.   It was very necessary that no dry clay go up into the press.   This fact had many times been impressed upon respondent, not only by directions of the foreman, but also by his knowledge of its effect upon the work of the plant.   He had been scolded several times by the foreman for letting dry clay go into the press and the head come down before taking it out.   He testified to instructions having been given him by the foreman, as follows:

"He told me whenever I saw some dry clay, to follow it up and pick it up, he says, 'Go on, go on, take that clay out wherever you find it; I don't want to take that die off all the time, we lose too much time.'"

This is the substance of instructions given him on several occasions.   The pressman, who was also foreman as to this work, had given these instructions.   It was a custom of respondent to follow up dry clay which accidentally got on the conveyor, and take it out, not only from the horizontal storage conveyor run by the feeder, but also to take it out of the top of the clay cylinder with his hands before the head came down.   Appellant knew of and sanctioned this custom, and the feeder and pressman also knew of it.   When respondent followed up the dry clay at the time of his injury he passed close to the pressman, who was facing towards respondent and evidently saw him pass.   He went immediately to the horizontal conveyor at the side of and close to the feeder,

saying to the feeder, "Jim there is some dry clay come up," who replied, saying, "I don't know, I didn't see any." He then examined with his hand the clay in the horizontal conveyor, and not finding the dry clay there, he said to the feeder, "The dry clay went into the press already; hold the press and don't let her go, I am going to pick out that piece of dry clay." The head of the press was then up and stationary, in its usual position while the press was being filled with clay. Some clay had passed into the press which had come up on the conveyor that morning, evidently being about the first clay coming up. This is to be kept in mind, for it is a fact very close to the cause of the starting of the press. Let us continue the story of respondent's acts and what he heard in his own language, given in answer to questions as follows:

"Q. Was the press in operation at that time? A. No, sir. Q. Then what did you do, Louis? A. Then I went down the steps, I took the torch and I went on my knee in front of the press— . . . I went on my knee in front of the press, and I had a torch in my right hand, and with my left hand I went in, in the press, to pick out that piece of dry clay. . . . And while I was down there looking in that clay for that piece of dry clay, I heard a bell and I— . . . I heard one bell. Q. And what does that mean? A. Means to go ahead. Q. What did you do next, Louis?. A. I tried to jerk back. I had this arm at the shoulder in the press and this one just about half way to the elbow and the hand, and I started to pull back, but before I had time to pull them clear out the head went down and cut them off."

There was no signal from the pressman by shaking the rod prior to the press starting. There was testimony introduced in behalf of appellant tending to show that a stick of wood, of sufficient size, was lying by the press to be put under the head on top of the clay cylinder for safety, when it was necessary to put one's hand in the cylinder, but respondent says he did not know of any such stick. The testimony of the pressman was to the effect that he did not start the press in response to a signal from the feeder, but that he was

then starting it for the first time in the morning for the usual purpose of working the water out of the clay left in the press over night. This, we think, is negatived by the evidence tending to show that that operation was performed before any fresh clay went into the press; that the feeding of fresh clay into the press had commenced, and the head was being held up for feeding; and that the pressman was awaiting a signal from the feeder to put the press in operation. The respondent and the pressman then employed had been employed at their respective stations for several years, and the feeder had been employed for several months. All of them were familiar with the conditions surrounding the operation of that part of the plant.

A careful review of the evidence convinces us that it was sufficient to warrant the jury in believing, that the taking of the clay out of the press by respondent with his hands was sanctioned by the appellant by custom and general instructions, if not by specific instructions; that the press was started by the pressman in response to a wrong signal given by the feeder while respondent's hands were in the press; that it was the duty of the feeder, as signalman, to signal, or withhold signaling, to the pressman, thus controlling the starting of the press, whether such control was required on account of clay being in the press ready for use, or on account of no clay being therein, or on account of respondent being there to remove dry clay, or for any reason there plainly calling for so controlling the press. The jury having evidently resolved the facts in favor of respondent upon these questions, we are of the opinion that the feeder was not a fellow servant of the plaintiff for the purpose of signaling to, or withholding signals from, the pressman, but that the feeder's negligence in performing that duty was the negligence of appellant. The following decisions of this court support this view: *Westerlund v. Rothschild*, 53 Wash. 626, 102 Pac. 765; *Mercereau v. Maughlin Mill Co.*, 53 Wash. 475, 102 Pac. 232; *Johnson v. Motor Shingle Co.*, 50

Wash. 154, 96 Pac. 962; *Maloney v. Stetson & Post Mill Co.*, 46 Wash. 645, 90 Pac. 1046; *Comrade v. Atlas Lumber & Shingle Co.*, 44 Wash. 470, 87 Pac. 517; *Westby v. Washington Brick, Lime & Mfg. Co.*, 40 Wash. 289, 82 Pac. 271; *Sroufe v. Moran Bros.*, 28 Wash. 381, 68 Pac. 896, 92 Am. St. 847, 58 L. R. A. 313. We conclude that the questions of appellant's negligence, and also of respondent's contributory negligence, could not be determined as a matter of law, and that they were properly submitted to the jury.

Some assignments of errors were made upon the instructions given, and requested instructions refused. These are discussed but slightly in appellant's brief, and we do not feel called upon to review them in detail here. We regard them all without merit. The learned trial court gave full and fair instructions to the jury, confining the issues within the narrow limits we have indicated by our discussion, as he also did in the conduct of the trial. We find no prejudicial error in the record. The judgment is affirmed.

DUNBAR, C. J., CROW, GOSE, and RUDKIN, JJ., concur.

FULLERTON, J., concurs in the result.