[No. 9413.   Department Two.   September 14, 1911.]

DONALD McLEOD, *Respondent*, v. CHICAGO, MILWAUKEE
AND PUGET SOUND RAILWAY COMPANY,
*Appellant.*[1]

NEGLIGENCE—PLEADING—COMPLAINT.   A complaint alleging that an act was negligently done is sufficient, as against a general demurrer, without setting out in detail the specific acts constituting the negligence.

MASTER AND SERVANT — SAFE PLACE — PLEADING — COMPLAINT— KNOWLEDGE OF DEFECT.   In pleading a negligent act by the master rendering a place unsafe, it is not necessary to plead knowledge by the master and want of knowledge of the servant, where the negligence consisted of an act of the master in the operation of the work, rendering the place instantly unsafe; since the master's knowledge is inferred, and the servant's want of knowledge is a matter of defense that need not be negatived in the complaint.

MASTER AND SERVANT—SAFE PLACE—INSTRUCTIONS—MASTER AS INSURER.   An instruction that a master owes not only the duty to provide a reasonably safe place to work, · but also to observe such care as not to expose servants to dangers which may be guarded against by reasonable care, is not objectionable as making the master an insurer.

MASTER AND SERVANT—SAFE PLACE—CHANGING CONDITIONS.   The master's duty to use reasonable care to furnish a safe place to work applies to a certain extent to the taking down of false work, and if the place is made unnecessarily dangerous by the negligence of the master, he is liable.

MASTER AND SERVANT—FELLOW SERVANTS—VICE PRINCIPAL—SU-PERINTENDENCE—FAILURE TO WARN.   A boss or foreman, whose prin-

[1]Reported in 117 Pac. 749.

cipal duties were those of direction in command of a crew of men removing the false work from a bridge, is a vice principal, with reference to his own act or his direct order whereby a plank was negligently thrown down without warning upon one of the crew engaged below; and it is immaterial whether he caused the plank to fall by his own act, or merely directed the removal of the support that held it.

MASTER AND SERVANT—NEGLIGENCE OF VICE PRINCIPAL—FAILURE TO WARN—EVIDENCE—SUFFICIENCY. It is negligence, for which the master is liable, for the foreman of a crew of men removing false work to attempt to move a plank in a manner in which one man could not hold it, or to direct the removal of its support, whereby it fell upon one of the crew engaged below, without any warning; the duty to warn being imperative.

MASTER AND SERVANT—ASSUMPTION OF RISKS—ACTS OF VICE PRINCIPAL. A bridge carpenter, setting jackscrews under a bridge that was being lowered, did not assume the risks of planks or crosspieces being thrown down upon him by the act or direction of the vice principal, where he had no warning that the men above removing the planks would throw them down.

MASTER AND SERVANT—EVIDENCE OF RELATION—QUESTION FOR JURY. In an action for personal injuries, the relationship of master and servant is for the jury, where there was evidence that he was employed by the defendant railway company, which defended the action throughout as the proper defendant, there being nothing to the contrary except a hint or suggestion in one question on cross-examination that the work was done by an ancillary company.

DAMAGES—PERSONAL INJURIES—EXCESSIVE VERDICT. A verdict for $3,000 for injuries sustained by a carpenter twenty-eight years old, through the fall of a heavy plank upon his wrist, is not excessive, where the wrist is probably permanently impaired, and movement produces a grating sound, showing injury to the bone which may result in necrosis.

Appeal from a judgment of the superior court for King county, Ronald, J., entered October 3, 1910, upon the verdict of a jury rendered in favor of the plaintiff, in an action for personal injuries sustained by a bridge carpenter through the falling of a plank. Affirmed.

*H. H. Field* and *Geo. W. Korte,* for appellant.

*William Parmerlee,* for respondent.

ELLIS, J.—Appeal from a judgment in favor of respondent for $3,000 for personal injuries, claimed to have been suffered by him while in the employ of appellant on July 6, 1909. The respondent was employed as a carpenter, some three or four days before the accident, by one A. B. Conley, general foreman in charge of the construction of four transfer bridges or apron slips along the waterfront at Ballard, Washington. These structures were being built in order to transfer cars from barges or ferries to railroad switch tracks running from different mills to the water's edge. In order to meet the fluctuations of the tide, these aprons are constructed extending into the water with a knuckle or socket at the land end, and counterweights at the outer end, permitting the aprons to rise and fall with the tide. The slips were first constructed upon false work, and when completed it was necessary to lower them into the sockets by means of two jackscrews at the land end while the supports in the false work were lowered under them. During construction, planks were placed along the top for the conveying of material and the passage of men to the outer end. On the slip in question three planks, each three inches thick, a foot wide, and fourteen or sixteen feet long, were placed side by side running the full length of the slip. At the time the respondent began work, this slip was about completed so as to be ready for lowering into the socket. On the day of the accident, he was working at one of the jackscrews under the slip at the land end near the socket. It does not definitely appear that the time had yet arrived for the entire removal of the false work, but it is evident that the plank walk or truckway on the top was to be removed.

The evidence is uncontradicted that Conley was general foreman in charge of the construction of the four slips and had the power of hiring and discharging men. He testified that it was customary to appoint a straw boss from among the men to superintend the work on each slip during his absence. He had appointed one Thomas McBurney as straw boss or foreman on this particular slip. While McBurney

worked with the other men, of whom at that time there were
about fifteen at work on this slip, they were all subject to his
orders and direction.   His main duty was that of direction,
as he was not expected to do any of the heavier work.   He
had no power to hire and discharge men.   The evidence shows
that he received· the same·pay as the carpenters, but more
than the other laborers.   Conley testified ·that, after he ap-
pointed McBurney as straw boss, he, Conley, was at that slip
probably twice a day and sometimes only once a day, and
that even when he was there McBurney still retained his au-
thority over the men.

At the time of· the accident, McBurney had taken all of the
men at work there excepting the respondent, and possibly one
other man, to the top of the slip for the purpose, as it ap-
pears, of removing the plank walk or truckway and lowering
the cross-supports, which were 12x12 timbers placed cross-
wise in the false work under the slip, so that the slip could be
further lowered upon them by means of the jackscrews.   Re-
spondent, McLeod, was at the time at work placing a block
for a foundation for a jackscrew which had to be reset.
Neither he nor any one else seems to recall whether the man
who had been working at the other jackscrew was then there.
Respondent was at the time from four to seven feet, most of
the witnesses say about six feet, below the slip.   The evi-
dence is contradictory as to just what the men on top of the
slip were doing at the time, but it seems almost conclusive
that they were starting to remove the planks, though Mc-
Burney testified that he did not intend to remove the planks,
but he did direct the removal of the cross-pieces in the false
work under the slip.   One C. W. Munsell, a workman there
at the time, testified as to how the accident occurred as fol-
lows:

"A.  The accident occurred by a man by the name of Mr.
McBurney lifting a plank, letting it loose from him, making
a remark at the time he·let it go, 'God damn it; I'll move that·

3—65 WASH.

plank'; simply because he had ordered us men to move it, and we hadn't had time yet to do it. The plank had a bearing in such a way that there was one long end and one short end. It had a bearing here (illustrating), and here· was the long end, and he took hold of it at the short end. When the plank had been freed from the bearing on the short end, it became so heavy here (indicating), that it went out of his hand like a flash, and down below, and struck this man on the hand as it went down. Q. What was McLeod doing at the time? A. That is something that you couldn't really prove by me truthfully, because he was underneath, and I couldn't say what he was doing. But he was working in the operation of the lowering of the bridge at the time, either in the blocking, or in the operating of the jacks, or something of that nature, underneath. Q. Was there an exclamation of pain from him when it struck him? A. There couldn't help but be. Q. Did you see his hand at the time? A. I didn't examine it closely; only from a distance of perhaps half a rod. I was above on the bridge, and as the plank went down, I looked down quick when a man by the name of Boyd hollered 'Jesus Christ, there's a man down there,' and I looked down then and saw that a man's hand was mashed, . . ."

McBurney testified as follows:

"A. Well, in moving this timber that was supported lower down—in the men moving that timber back, they let the other board slip off the end of the slip, and it fell down. One end of the plank was on this timber, and the other end was on the end of the slip, where Mr. McLeod was working right under with the jack. Q. Who was moving the timber. A. The men were moving the timber, I don't know which ones. Q. Do you remember whether or not you personally were moving the timber? A. I was engaged in moving the timbers, but I don't just remember that."

Respondent testified as follows:

"A. I was helping to lower the bridge, or the slip, with a jack. I had a jack on top of this socket here, and the other end—I don't know whether it was on the stringers, or on the end of the bridge. It was at the end of the bridge, anyway. It was in a fixed position, and I couldn't lower the bridge any lower than the jack was, because the bridge was

down to the full length of the jack, when it was down. I had to move this jack to some other place a little farther in. That was the only place there was. There was two timbers below there, and I had to get a block across there to rest the jack on. When I was getting that block ready, the plank came down on top of me. Q. Did you have any warning that they were going to throw plank down on you? A. No, sir. Q. How did it hit you? A. My hand was on top of that block somehow, and the plank came down on. top of it, here (indicating) . . . Q. Tell the jury how it hurt you. A. The plank came down on top of my wrist. This was cut here, and it was bruised on this side here below (indicating). That is all I can tell you."

The allegations of the complaint as to the employment, negligence, and injury are as follows:

"That on July 6th, 1909, plaintiff was employed by defendant as a carpenter, and was engaged in his said work for defendant on a slip at Ballard, Washington, and while the plaintiff was so engaged in his said work, the said defendant so carelessly and negligently conducted and operated the building of said slip so as to cause a plank or timber to fall from the top of said slip down to and on the plaintiff, striking the right hand of the plaintiff and greatly damaging and injuring the same."

A general demurrer to the complaint was overruled. This is assigned as error, the contention being that the complaint states no facts, alleges no breach of duty, nor any negligent act of which respondent was ignorant, and of which appellant had knowledge as the proximate cause of the injury, and that the allegations are mere conclusions. Appellant cites many authorities from other states holding that a general allegation that an act was negligently done is not sufficient under statutes similar to Rem. & Bal. Code, § 258. We find, however, that the decided weight of authority is contrary to this view.

"The rule is well-nigh universal that, in an action for negligence, the plaintiff need not set out in detail the specific acts

constituting the negligence complained of, as this would be pleading the evidence." 14 Ency. Plead. & Prac., p. 333.

See, also, 29 Cyc. 570; *Oldfield v. New York & H. R. Co.*, 14 N. Y. 310; *Hammond & Co. v. Schweitzer*, 112 Ind. 246, 13 N. E. 869; *Rushville v. Adams*, 107 Ind. 475, 8 N. E. 292, 57 Am. Rep. 124; *Clark v. Chicago, M. & St. P. R. Co.*, 28 Minn. 69, 9 N. W. 75; *Lucas v. Wattles*, 49 Mich. 380, 13 N. W. 782; *Ekman v. Minneapolis St. R. Co.*, 34 Minn. 24, 24 N. W. 291; *Louisville & N. R. Co. v. Wolfe*, 80 Ky. 82.

Moreover this court has adopted the more liberal rule. It is no longer an open question in this state. *Collett v Northern Pac. R. Co.*, 23 Wash. 600, 63 Pac. 225; *Uren v. Golden Tunnel Min. Co.*, 24 Wash. 261, 64 Pac. 174; *Cogswell v. West St. & N. E. Elec. R. Co.*, 5 Wash. 46, 31 Pac. 411.

Counsel cite authorities to the effect that where the negligence sought to be established is the failure of the master to provide a safe place or safe appliances, knowledge of the defect by the master and want of knowledge by the servant must be affirmatively alleged. That rule has reference to the maintenance of conditions and appliances of a more or less permanent character, such that the master and the servant may have equal opportunity to know of the defect and consequent danger; not to a case where the place is rendered unsafe in an instant by the master or his agent. The negligence in such a case is not primarily a failure to furnish a safe place, but negligence in the operation of the work so that the place becomes instantaneously unsafe. When the act is such that it must, in the nature of things, make unsafe the servant's place of work, knowledge of that fact must of necessity be inferred from pleading the act. The principle contended for by appellant arises more frequently in connection with the duty to inspect and remedy defects than in any other class of cases. It would seem to be an application of a sound principle in an unsound way to invoke this rule strictly in a case such as here presented. Even where the primary negligence is the failure to inspect, provide and maintain a safe

place, the knowledge of the master, when it may be inferred from the facts pleaded, is sufficiently pleaded as against demurrer.  *Gibson v. Chicago, M. & P. S. R. Co.*, 61 Wash. 639, 112 Pac. 919.

"Such knowledge by the defendant is generally regarded as sufficiently averred by an allegation that the defendant negligently permitted appliances to become defective and negligently suffered them to remain in a defective condition." 6 Thompson, Negligence, p. 551, § 7529.

See, also, *Chicago, B. & Q. R. Co. v. Kellogg*, 55 Neb. 748, 76 N. W. 462; *Illinois Steel Co. v. Ostrowski*, 93 Ill. App. 57; *O'Connor v. Illinois Cent. R. Co.*, 83 Iowa 105, 48 N. W. 1002; *Crane v. Missouri Pac. R. Co.*, 87 Mo. 588; *Hall v. Missouri Pac. R. Co.*, 74 Mo. 298; *Hoffman v. Dickinson*, 31 W. Va. 142, 6 S. E. 53.

Such an allegation is held good even against demurrer. *Chicago & E. I. R. Co. v. Hines*, 132 Ill. 161, 23 N. E. 1021, 22 Am. St. 515; *Wedgwood v. Chicago & N. W. R. Co.*, 41 Wis. 478.

As to failure to allege want of knowledge on the part of the respondent, the rule contended for has no application in this state. Knowledge of the respondent is only material as an element either in assumption of risk or contributory negligence. Here both of these are matters of defense and need not be negatived in the complaint. 6 Thompson, Negligence, § 7531; *Randall v. Hoquiam*, 30 Wash. 435, 70 Pac. 1111; *Currans v. Seattle & San Francisco R. & Nav. Co.*, 34 Wash. 512, 76 Pac. 87. The complaint, though meager in its allegations and not to be commended, should be held to state a cause of action under the liberal rule made incumbent on this court by statute. Rem. & Bal. Code, § 1752.

The court gave the following instruction:

"The master owes a duty to his employee, not only to provide him with a reasonably safe place in which to work, so far as the nature of the work undertaken and the exigencies of the case will permit the same to be made reasonably safe,

but also to observe such care as will not expose the employee to perils and dangers which may be guarded against by reasonable care and diligence."

Appellant claims that this instruction is erroneous as imposing upon the master the absolute duty to furnish a reasonably safe place, while the legal duty is to use reasonable care to furnish a reasonably safe place. The instruction complained of is not open to the objection urged. It only requires the master to exercise reasonable care and diligence in any event. It is taken almost verbatim from the language of this court in *McDonough v. Great Northern R. Co.*, 15 Wash. 244, 46 Pac. 334, at page 257, which has since been followed and quoted with approval many times. *Shannon v. Consolidated Tiger & Poorman Min. Co.*, 24 Wash. 119, 64 Pac. 169; *O'Brien v. Page Lumber Co.*, 39 Wash. 537, 82 Pac. 114; *Mullin v. Northern Pac. R. Co.*, 38 Wash. 550, 80 Pac. 814; *Sandquist v. Independent Tel. Co.*, 38 Wash. 313, 80 Pac. 539. A broader instruction was sustained in *Gustafson v. Seattle Traction Co.*, 28 Wash. 227, 68 Pac. 721, and in *Harris v. Brown's Bay Logging Co.*, 57 Wash. 8, 106 Pac. 152.

It is next contended that the safe place rule has no application to the situation here presented, because the false work was being removed and the conditions were necessarily changing and dangerous, as in the construction, demolition or repair of a building. But the servant does not assume the risk of every danger even in such cases. As in other cases, he assumes the risk of such dangers only as are necessarily incident to the work. The difference is not in the rule but in the greater number of dangers incident to the work. The real question in any case is as to what constitutes reasonably careful conduct on the part of the master looking to reasonable safety for the men.

"If it is the master's duty to furnish the servant a safe place in which to work, it is just as much his duty to furnish that safe place where the work to be performed is the de-

molition or tearing down of a building, as where it is its construction in the first instance." *Liedke v. Moran Bros. Co.,* 43 Wash. 428, 86 Pac. 646, 117 Am. St. 1058.

See, also, *Etheridge v. Gordon Construction Co.,* 62 Wash. 256, 113 Pac. 639. If the place was made unnecessarily dangerous through the negligent act of the master or its vice principal, the master is liable for injury resulting therefrom.

There can be no question that McBurney was a vice principal. While he had no power to hire and discharge men, he was at least a servant in command at that particular slip. The principal in such a case is liable for any negligence on the part of the servant in command in connection with his management of the work while it is under his direction. Under either version of the story as to how the plank came to fall, McBurney was responsible for it in this capacity. He says the plank lay with one end on the shore end of the slip under which McLeod was working, and the other on a cross-piece in the false work. As to the falling of the plank, his testimony was as follows:

"Q. You had directed that this planking be moved, had you? A. No; not the planking. Q. Did you direct that the plank that fell on McLeod be moved? A. No, I did not direct that the plank be moved, but the cross-timbers. Q. The cross-timbers? A. Yes, sir. Q. In moving the cross-timbers the plank fell? A. Yes, sir; that is it."

From his own testimony he ordered the support from one end of the plank removed. A mere knowledge of the law of gravitation should have told him that the plank would fall. On the other hand, Munsell testified that McBurney ordered the men to move the planks, that they were not quick enough, and that McBurney, with an oath, attempted to do it alone, and the plank went out of his hand like a flash. To attempt to move a plank three inches thick, a foot wide, and fourteen to sixteen feet long, lying as he says this plank lay, without assistance, was certainly an act which the jury were justified in finding negligent. Under this view of the evidence, the

case comes directly under the rule announced in *Nelson v. Willey Steamship & Nav. Co.,* 26 Wash. 548, 67 Pac. 237. If he had ordered one of the workmen to remove the plank without assistance, and the workman had made the attempt, the same result must inevitably have followed. The fact that he did the act himself does not alter the case. *Sullivan v. Wood & Co.,* 43 Wash. 259, 86 Pac. 629, 117 Am. St. 1047; *Sroufe v. Moran Bros. Co.,* 28 Wash. 381, 68 Pac. 896, 92 Am. St. 847, 58 L. R. A. 313; *Creamer v. Moran Bros. Co.,* 41 Wash. 636, 84 Pac. 592; *Campbell v. Jones,* 60 Wash. 265, 110 Pac. 1083. A dangerous agency was set in motion, either by the direct act or by the direct order of the vice principal. The duty to warn in advance was imperative. *O'Brien v. Page Lumber Co., Uren v. Golden Tunnel Min. Co., and Shannon v. Consolidated Tiger & Poorman Min. Co., supra; Grosjean v. Denny-Renton Clay & Coal Co.,* 62 Wash. 196, 113 Pac. 570.

Appellant seeks to distinguish this case on the ground that no warning was necessary because the plank was not to be thrown below but removed. McBurney knew that he was going to order either the planks removed, as Munsell says he did, or the cross-pieces under them removed, as McBurney says he did. He must have known that either would render the place beneath unsafe. The duty to warn the man below was plain. He seemed to recognize this. He testified that he ordered the men out at least three times prior to the removal of the timber, but on this point there is a direct conflict of evidence. Munsell, who was near McBurney, testified that he heard no such order, and the respondent testified that he did not hear it. The question as to whether the order was given was for the jury.

Respondent knew that some of the men were on the slip above him, but there is no evidence, aside from the disputed warning, that he knew they were going to remove either the planks or the cross-pieces. If he had no warning he cannot be held to have assumed the increased risk of danger occa-

sioned by that work. The decisions cited. by appellant in this connection: *Cavelin v. Stone & Webster Eng. Corp.*, 61 Wash. 375, 112 Pac. 349; *Jock v. Columbia & Puget Sound R. Co.*, 53 Wash. 437, 102 Pac. 405; *Desjardins v. St. Paul & Tacoma Lumber Co.*, 54 Wash. 278, 102 Pac. 1034; *Mercer v. Lloyd Transfer Co.*, 59 Wash. 560, 110 Pac. 389; *Magnuson v. Chicago, M. & St. P. R. Co.*, 58 Wash. 141, 107 Pac. 1043; *Deaton v. Abrams*, 60 Wash. 1, 110 Pac. 615, are none of them apposite. In all of these cases the men were engaged in a common and simple work in which the injured man was assisting, knew what was being done, and had an opportunity to observe how it was done, and to protect himself from the negligence of the others. No such case is presented by the evidence here. In *Larsen v. Covington Lumber Co.*, 53 Wash. 146, 101 Pac. 717, the act causing the injury was done by the injured man himself with full knowledge of the danger.

Appellant contends that there was a failure of proof of the relationship of master and servant. We find no merit in this contention. Respondent was hired by Conley, the general foreman in charge of the work. The timekeeper on the work was permitted to testify from his books as to the men employed, among them the respondent, and it was at no time suggested they were not the appellant's books. The respondent testified as follows:

"Q. Now how long had you been employed at Ballard by the defendant company before you were injured? A. About four days."

Munsell testified:

"Q. And McLeod was employed by the company, the defendant? A. Yes, sir."

Near the close of the trial, McBurney was asked if he knew where the slip was, and answered in the affirmative. He was then asked, "Q. Built out there by the Milwaukee Terminal Co.?" and answered, "Yes, sir." This is the only evi-

dence that the appellant, who had defended throughout as the proper party defendant, was not such. We cannot take judicial notice on a mere hint that the appellant constructed and operated its terminal facilities through an ancillary company. The question of employment was for the jury, and on the evidence the jury was justified in finding the employment as alleged.

Finally, it is claimed that the verdict was excessive. The respondent is only twenty-eight years old. His expectancy of life is over thirty-four years. The evidence indicates that the use of his right wrist is probably permanently impaired; that the movement of the wrist produces a grating or rattling sound, showing an injury to the bone which may result in necrosis. He is a carpenter by trade, and dependent on the use of his hands for a livelihood. While the verdict is probably larger than we would have awarded had we been the jurors, we cannot say that it was so large as to indicate passion, prejudice, or other improper motive on the part of the jury.

Error is also predicated on the court's refusal to give several instructions requested by appellant. We have examined the instructions offered and those given, and find that the instructions as given by the court fairly and fully cover the law of the case as we conceive it to be. There is no prejudicial error in the refusal of the requested instructions.

Judgment affirmed.

DUNBAR, C. J., CROW, and MORRIS, JJ., concur.